867 A.2d 1147

U.S. SPORTSMEN'S ALLIANCE FOUNDATION; NEW JERSEY STATE FEDERATION OF SPORTSMEN'S CLUBS; GERALD MCCUSKER; ANTHONY CALI; AND EDWARD O'SULLIVAN, APPELLANTS–RESPONDENTS, v. NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; BRADLEY M. CAMPBELL, IN HIS CAPACITY AS NJDEP COMMISSIONER; NEW JERSEY DIVISION OF FISH & WILDLIFE; AND MARTIN J. MCHUGH, IN HIS CAPACITY AS DIRECTOR OF THE DIVISION, RESPONDENTS–APPELLANTS.

Argued November 29, 2004—Decided February 28, 2005.

464

*Barbara L. Conklin,* Deputy Attorney General, argued the cause for appellants (*Peter C. Harvey,* Attorney General of New Jersey, attorney; *Patrick DeAlmeida,* Assistant Attorney General, of counsel; *Ms. Conklin, Rachel J. Horowitz* and *Dean Jablonski,* Deputy Attorneys General, on the brief).

*Thomas J. Cafferty* argued the cause for respondents (*McGimpsey & Cafferty,* attorneys; *Arlene M. Turinchak,* on the brief).

Justice LONG delivered the opinion of the Court.

On December 2, 2004, by order, we enjoined the bear hunt that the Fish and Game Council had scheduled to take place during the week of December 6, 2004. The case came to us as a result of a dispute between the Fish and Game Council and the Commissioner of the Department of Environmental Protection (DEP) regard-

ing the propriety of the hunt. Our order provided, among other things, that the failure of the Fish and Game Council to have developed comprehensive policies for the protection and propagation of the bear population, with the approval of the Commissioner, as required by *N.J.S.A.* 13:1B–28, made resolution of the dispute impossible. In ruling, we promised a fuller exposition of our reasoning in an opinion to follow. This is that opinion.

## I.

The complete facts and procedural history of this case are reported in *U.S. Sportsmen's Alliance Foundation v. New Jersey Department of Environmental Protection*, 372 *N.J.Super.* 598, 860 *A.*2d 463 (App.Div.2004). In a nutshell, in early 2004, the Fish and Game Council considered a proposal to hold a bear hunt similar to the hunt that had taken place in 2003. The 2003 bear hunt was the first authorized in New Jersey since 1970.[1] The Commissioner publicly supported the 2003 hunt; it was not until 2004 that he opposed a hunt outright due to fiscal concerns, the decrease in bear-human interactions, and the lack of data supporting the Division of Fish and Wildlife's (Division) projections regarding the bear population. Notwithstanding that opposition, the Fish and Game Council adopted the 2004–2005 Fish and Game Code that authorized the bear hunt. The Commissioner subsequently directed the Division not to issue or process applications for bear hunting permits. The U.S. Sportsmen's Alliance Foundation, New Jersey State Federation of Sportsmen's Clubs, Gerald McCusker, Anthony Cali, and Edward O'Sullivan filed a notice of appeal challenging the Commissioner's directive.

The Appellate Division held that the Commissioner lacks the statutory authority to enjoin the issuance of bear hunt permits or

---

[1] The Fish and Game Council had proposed a bear hunt in 2000, but cancelled it on the request of then-Governor Christine Todd Whitman. 32 *N.J. Reg.* 3592(a); New Jersey Fish and Game Council, *New Jersey Fish and Game Council Suspends Black Bear Hunting Season* (Sep. 12, 2000), at *http://www.state.nj.us/dep/fgw/cnclnobr.htm.*

to otherwise interfere with Fish and Game Code regulations governing the hunt.

The DEP, the Commissioner, the Division, and the Director of the Division (collectively the Commissioner) petitioned for certification, which we granted. *U.S. Sportsmen's Alliance Found. v. N.J. Dept. of Envtl. Prot.*, 182 *N.J.* 151, 862 *A.2d* 59 (2004).

## II.

The case revolves around the statutes governing the operations of the Fish and Game Council. *N.J.S.A.* 13:1B–28 provides:

In addition to its powers and duties otherwise hereinafter provided, *the Fish and Game Council shall, subject to the approval of the commissioner, formulate comprehensive policies* for the protection and propagation of fish, birds, and game animals and for the propagation and distribution of food fish and for the keeping up of the supply thereof in the waters of the State.

The council shall also:

a. Consult with and advise the commissioner and director of the Division of Fish and [Wildlife] with respect to the work of such division.

b. Study the activities of the Division of Fish and [Wildlife] and hold hearings with respect thereto as it may deem necessary or desirable.

c. Report to the Governor and the Legislature annually, and at such other times as it may deem in the public interest, with respect to its findings and conclusions.

[*N.J.S.A.* 13:1B–28 (emphasis added).]

*N.J.S.A.* 13:1B–30 goes on to state:

For the purpose of providing an adequate and flexible system of protection, propagation, increase, control and conservation of fresh water fish, game birds, game animals, and fur-bearing animals in this State, and for their use and development for public recreation and food supply, the council is hereby authorized and empowered to determine under what circumstances, when and in what localities, by what means and in what amounts and numbers such fresh water fish, game birds, game animals, and fur-bearing animals, or any of them, may be pursued, taken, killed, or had in possession so as to maintain an adequate and proper supply thereof, and may, after first having determined the need for such action on the basis of scientific investigation and research, adopt and from time to time amend and repeal such appropriate and reasonable regulations concerning the same, or any of them, penalties for the violation of which are prescribed by certain of the sections of Title 23 of the Revised Statutes amended herein, as it deems necessary to preserve, properly utilize or maintain the best relative number of any species or variety thereof, at the times, in the manner and to the extent hereinafter provided. The regulations so established shall be called the State Fish and Game Code.

[*N.J.S.A.* 13:1B–30.]

## *N.J.S.A.* 13:1B–32, in turn, provides:

Any regulation of the council or amendment thereto adopted pursuant to the provisions of this article which relates to game birds, game animals or fur-bearing animals, after the council has first determined the need for such action on the basis of scientific investigation and research, may apply to all or any part of the State, at the discretion of the council, and may do any or all of the following as to any or all species or varieties of game birds, game animals, and fur-bearing animals:

a. Establish, extend, shorten or abolish open seasons and closed seasons.

b. Establish, change or abolish bag limits and possession limits.

c. Establish and change territorial limits for the pursuit, taking, or killing of any or all species or varieties.

d. Prescribe the manner and the means of pursuing, taking, or killing any species or variety.

e. Establish, change or abolish restrictions based upon sex, maturity, or other physical distinction.

[*N.J.S.A.* 13:1B–32.]

The Commissioner argues that the approval authority over comprehensive policies of the Fish and Game Council vested in him by *N.J.S.A.* 13:1B–28 is the legislative vehicle that accords him, as the administrative head of the DEP, the power to assure that the Fish and Game Council's actions concerning hunting and fishing are consistent with the DEP's overall policies. The Commissioner reads that approval language as granting him veto power over actions of the Fish and Game Council that are out of synchronicity with the DEP's policies.

The Fish and Game Council responds that the plain language of the statute reflects that the Council has hegemony over the Fish and Game Code and over hunting (*N.J.S.A.* 13:1B–28 and 30), independent of the Commissioner's general authority to formulate agency policy. As such, it is the Fish and Game Council's position that the Commissioner is powerless to prevent it from deciding to hold a bear hunt, enacting a Fish and Game Code by regulation, and issuing or processing applications therefor. It is the interplay of *N.J.S.A.* 13:1B–28, –30, and –32 that is the focus of our inquiry.

## A.

In interpreting a legislative enactment, the starting point is always the language of the statute itself. If it is clear, " 'the sole function of the courts is to enforce it according to its terms.' " *Hubbard ex rel. Hubbard v. Reed*, 168 *N.J.* 387, 392, 774 *A.*2d 495 (2001)(quoting *Sheeran v. Nationwide Mut. Ins. Co.*, 80 *N.J.* 548, 556, 404 *A.*2d 625 (1979)(quoting *Caminetti v. United States*, 242 *U.S.* 470, 485, 37 *S.Ct.* 192, 194, 61 *L.Ed.* 442, 452 (1917))). However, "[w]hen a statute is subject to more than one plausible reading, our role is 'to effectuate the legislative intent in light of the language used and the objects sought to be achieved.' " *Velazquez ex rel. Velazquez v. Jiminez*, 172 *N.J.* 240, 256, 798 *A.*2d 51 (2002)(quoting *State v. Hoffman*, 149 *N.J.* 564, 578, 695 *A.*2d 236 (1997)(internal citations omitted)). In the end, our interpretation will not "turn on literalisms" but "on the breadth of the objectives of the legislation and the commonsense of the situation." *LaFage v. Jani*, 166 *N.J.* 412, 431, 766 *A.*2d 1066 (2001)(quoting *Jersey City Chapter of Prop. Owner's Protective Ass'n v. City Council*, 55 *N.J.* 86, 100, 259 *A.*2d 698 (1969)).

As is often the case, the parties disagree over the clarity and meaning of the enactment at issue. We begin with the language of *N.J.S.A.* 13:1B–28: "[T]he Fish and Game Council shall, subject to the approval of the commissioner, formulate comprehensive policies for the protection and propagation of fish, birds, and game animals...." That is the provision against which the words of *N.J.S.A.* 13:1B–30 and –32 must be measured. The critical language of *N.J.S.A.* 13:1B–30 is as follows:

[T]he Council is hereby authorized and empowered to determine under what circumstances, when and in what localities, by what means and in what amounts and numbers such ... fur-bearing animals, ... may be pursued, taken, killed, or had in possession so as to maintain an adequate and proper supply thereof, and may, ... adopt and from time to time amend and repeal such appropriate and reasonable regulations concerning the same,....

[*N.J.S.A.* 13:1B–30.]

*N.J.S.A.* 13:1B–32 repeats that authorization and states that the Fish and Game Council may by regulation "establish, extend,

shorten, or abolish open seasons and closed seasons" and may "prescribe the manner and the means of pursuing, taking or killing any species or variety." *N.J.S.A.* 13:1B–32(a), (d). Both statutes require "scientific investigation and research" to justify action. *N.J.S.A.* 13:1B–30, –32.

We are not persuaded that the cited enactments are clear. Standing alone, although *N.J.S.A.* 13:1B–30 and –32 afford substantial authority to the Fish and Game Council in respect of hunting, the outer limit of that authority is not evident. One plausible reading is that the Fish and Game Council has the power to decide whether a hunt should take place without regard to the Commissioner. An equally plausible interpretation is that, fairly read, the statutes empower the Fish and Game Council to authorize a hunt only in accordance with comprehensive policies formulated by the Fish and Game Council and Commissioner. In a word, the statute is ambiguous at best, and thus we turn to its legislative history for clarification.

### B.

In the years prior to the adoption of the State Constitution of 1947, the New Jersey Commission on State Administrative Reorganization (Reorganization Commission) submitted a report proposing a reordering of state government, which, until that time, had operated through a continuously proliferating series of over 100 independent and uncoordinated state agencies and an additional fifty semi-independent boards and commissions. New Jersey Commission on State Administrative Reorganization, *Report— Part I*, at Letter 1–2 (Feb. 21, 1944). The jurisdiction and functioning of those entities often overlapped and were not subject to gubernatorial oversight. *Id.* at Letter 1. The charge of the Reorganization Commission was to suggest a more efficient model with no more than twenty departments in the executive branch. *Ibid.*

With respect to the Department of Conservation, the Reorganization Commission posited that the new department take over

eleven existing agencies and consolidate them into five new entities: the Divisions of Fish and Game, Shell Fisheries, Natural Resources, Parks and Historic Sites, and Navigation. New Jersey Commission on State Administrative Reorganization, *Report— Part IV,* at Memorandum 1–2 (Jan. 29, 1945).

According to the Reorganization Commission, such reorganization would better coordinate "related activities and give unity to the State's program for the preservation and use of its natural resources." *Id.* at Memorandum 1. The Reorganization Commission envisioned that each division would be supervised by a non-salaried council, and that a Commissioner would serve as "the chief fiscal officer of the department," "charged with the duty of coordinating the activities of the related agencies in the department." *Id.* at Memorandum 2. The report states, "[a] well balanced and coordinated program affecting all conservation activities can best be planned and executed within the framework of a single department," and continues, "[t]he Commissioner will be able to accomplish such integration effectively through his power to approve or disapprove the actions of the councils in the exercise of their various powers." *Id.* at Memorandum 3. Indeed, the Reorganization Commission went so far as to suggest that the new Commissioner "exercise veto power over the actions of the councils...." *Id.* at Memorandum 2. Specifically addressing the Division of Fish and Game, the report states, "No action shall be taken by [the Fish and Game Council] except upon approval by the commissioner of conservation." *Id.* at Act 8.

Inspired by that report, the framers of the New Jersey Constitution of 1947 included a mandate that "[a]ll executive and administrative offices, departments, and instrumentalities of the State government ... shall be allocated by law among and within not more than twenty principal departments." *N.J. Const.* art. V, § 4, ¶ 1. The following paragraph positions all principal departments under the supervision of the Governor and places a single executive, appointed by the Governor with Senate approval, at the helm of each principal department. *N.J. Const.* art. V, § 4, ¶ 2. Those

two paragraphs of the Constitution form the basis for a "streamlined, modern, and accountable executive branch." Robert F. Williams, *The New Jersey State Constitution* 90 (Rutgers Univ. Press 1997) (1990).

In his First Annual Message, Governor Alfred Driscoll referred to the "Constitutional mandate" commanding the reorganization of the executive branch of state government. Alfred E. Driscoll, *First Annual Message to the Legislature* (Jan. 13, 1948). The Governor proposed that that mandate be fulfilled by the establishment of fifteen principal departments, including Economic Development, the department that includes Conservation. *Ibid.*

The Laws of 1948, chapter 448, established the Department of Conservation and Economic Development, now the DEP. A Commissioner, appointed by the Governor with the advice and consent of the Senate, is the administrator and head of the DEP. *N.J.S.A.* 13:1B–2. The duties of the Commissioner are enumerated in *N.J.S.A.* 13:1B–3:

The commissioner, as head of the department, shall:

a. Administer the work of the department;

b. Appoint and remove officers and other personnel employed within the department, subject to the provisions of Title 11 of the Revised Statutes, Civil Service, and other applicable statutes, except as herein otherwise specifically provided;

c. Perform, exercise and discharge the functions, powers and duties of the department through such divisions as may be established by this act or otherwise by law;

d. Organize the work of the department in such divisions, not inconsistent with the provisions of this act and in such bureaus and other organizational units as he may determine to be necessary for efficient and effective operation;

e. Adopt, issue and promulgate, in the name of the department, such rules and regulations as may be authorized by law;

f. Formulate and adopt rules and regulations for the efficient conduct of the work and general administration of the department, its officers and employees;

g. Institute or cause to be instituted such legal proceedings or processes as may be necessary properly to enforce and give effect to any of his powers or duties;

h. Make an annual report to the Governor and to the Legislature of the department's operations, and render such other reports as the Governor shall from time to time request or as may be required by law.

i. Co-ordinate the activities of the department, and the several divisions and other agencies therein, in a manner designed to eliminate overlapping and duplicating functions;

j. Integrate within the department, so far as practicable, all staff services of the department and of the several divisions and other agencies therein; and

k. Perform such other functions as may be prescribed in this act or by any other law.

[*N.J.S.A.* 13:1B–3.]

Within the reorganized DEP, the Legislature established the Division of Fish and Game, currently called the Division of Fish and Wildlife. The structure and duties of the Division are set forth in Articles IV and V, *N.J.S.A.* 13:1B–23 to –41, of the Department of Environmental Protection Act of 1970, *N.J.S.A.* 13:1B–2 to –71. Charged with the responsibility for protecting, propagating, and maintaining an adequate supply of fish, game, and birds, the Division is under the immediate supervision of a director who, in turn, "shall administer the work of such division under the direction and supervision of the commissioner." *N.J.S.A.* 13:1B–27, –28, & –30.

The Division, in turn, houses a Fish and Game Council made up of eleven members, appointed by the Governor with the advice and consent of the Senate, who are experienced in agriculture, wildlife, species conservation, and land use and have the "independent responsibility to adopt a Fish and Game Code for the purpose of providing a system for the protection and conservation of fish and game." *N.J.S.A.* 13:1B–24; N.J. Dep't of Envtl. Prot. Div. of Fish and Wildlife, *Fish and Wildlife Councils and Committees—Powers & Duties,* at *http://www.state.nj.us/dep/fgw/councils.htm# fishandgame* (last revised Jan. 20, 2005). Thus, the Legislature effectuated the goals of the Reorganization Commission by consolidating all natural resources divisions under a single department, led by a Commissioner whose obligation it is to coordinate a unitary approach to conservation and to oversee the use of the agency's financial resources.

■ Although the Legislature enacted those broad objectives into law, it declined to grant the Commissioner the explicit veto power, contemplated by the Reorganization Commission, over all the actions of the councils. As the Appellate Division recognized, the bill made no mention of the Commissioner's right to veto Council initiatives. *U.S. Sportsmen's Alliance, supra,* 372 *N.J.Super.* at 606, 860 *A.*2d 463. Accordingly, it is clear that despite the Commissioner's transcendent obligation to coordinate and oversee the DEP's environmental protection and conservation initiatives, the Legislature granted substantial independence to the Fish and Game Council and withheld from the Commissioner overall supervisory power over the Fish and Game Council, probably as the result of a political compromise.

■ However, although the Legislature did not give the Commissioner absolute veto power over the Fish and Game Council's day-to-day activities, neither did it grant the Fish and Game Council total hegemony. It bears repeating that in its first explication of the Fish and Game Council's responsibilities, the statute states,

the Fish and Game Council shall, *subject to the approval of the commissioner,* formulate comprehensive policies for the protection and propagation of fish, birds, and game animals and for the propagation and distribution of food fish and for the keeping up of the supply thereof in the waters of the State.

[*N.J.S.A.* 13:1B–28(emphasis added).]

It is that approval language that is the nub of this case.

Indeed, that approval language is key to placing the work of the Fish and Game Council, which concededly has substantial independence, in context. Although its expertise over hunting issues is recognized in *N.J.S.A.* 13:1B–30, *N.J.S.A.* 13:1B–28 underscores that the Fish and Game Council clearly does not function as a completely autonomous body, unaccountable to the department head. Rather, the Commissioner must approve the Fish and Game Council's comprehensive policies. It is the Commissioner's approval that, in turn, insures that those policies comport with department-wide goals for environmental protection.

Our conclusion is bolstered by our review of the legislation governing other divisions and councils within the DEP. Every division discussed in *N.J.S.A.* 13:1B is headed by a director who operates under the direction and supervision of the Commissioner. *N.J.S.A.* 13:1B–8 (addressing Director of Division of Coastal Resources); *N.J.S.A.* 13:1B–15.100, –15.102 (addressing Director of Division of Parks and Forestry); *N.J.S.A.* 13:1B–19 (addressing Director of Division of Veterans' Services); *N.J.S.A.* 13:1B–27 (addressing Director of Division of Fish Wildlife); *N.J.S.A.* 13:1B–48 (addressing Director of Division of Water Resources). Like the Fish and Game Council, the Division of Parks and Forestry and the Division of Shell Fisheries, specifically the Shell Fisheries Council, are obligated to formulate comprehensive policies; the former body must do so "as the Commissioner may direct," *N.J.S.A.* 13:1B–15.105, and the latter entity acts subject to the approval of the Commissioner. *N.J.S.A.* 50:1–18(b).

■ Within DEP divisions are agencies like the Fish and Game Council. Although not identical due to amendments at various times, the leitmotif that runs through all of the relevant enabling legislation is the interconnection between the councils and the Commissioner and the recognition that while those entities possess authority in varying levels, their independence is constrained by their uniform subjugation to DEP authority.[2] Specifically in

---

[2] For example, the Tidelands Resource Council acts only with the approval of the Commissioner. *N.J.S.A.* 13:1B–10, –13. The National Areas Council requires the Commissioner's approval to acquire lands and enact rules and regulations. *N.J.S.A.* 13:1B–15.9, –15.10. The New Jersey Natural Lands Trust cannot incur debt in the purchase of lands without the "express approval" of the Commissioner. *N.J.S.A.* 13:1B–15.125. The Historic Sites Council is advisory only; it can do no more than recommend programs and policies to the Commissioner. *N.J.S.A.* 13:1B–15.110. The Water Supply Advisory Council similarly functions only to "advise" the DEP. *N.J.S.A.* 13:1B–49.3. The Shell Fisheries Council may not, without the Commissioner's approval, fix the term for leases, the rental amount, the maximum size of ground to be leased, or the total acreage that may be leased to any person. *N.J.S.A.* 50:1–27.

Furthermore, that hierarchy is not unique to the DEP, as evidenced by the entities discussed in *N.J.S.A.* 13:1B that are situated in other departments, e.g.,

the instance before us, the Fish and Game Council's ability to authorize a bear hunt is subject to the statutory condition precedent of the Commissioner's earlier approval of the very comprehensive policies governing the propagation of black bears.

Our conclusion regarding the Commissioner's authority is ineluctable not only because of the approval language but because the entire statutory scheme was intended to create a unified approach to conservation and environmental protection under the authority of the Commissioner. Although the Fish and Game Council may act without day-to-day veto by the Commissioner, its actions exist within a larger universe of comprehensive environmental policies. If it does not act in accord with those policies, the Commissioner is empowered to intervene.

## V.

The Fish and Game Council argues that its decision to hold a bear hunt in 2004 fully accorded with "comprehensive policies" in effect. According to the Fish and Game Council, those policies are set forth in the *New Jersey Black Bear Management Plan Summary 1997*, a document developed by the Division. They are (1) to maintain a balance between black bear population and safety concerns and (2) to provide recreational and aesthetic opportunities for New Jersey citizens in the form of hunting, photography, and wildlife observation.

Separate and apart from the age of that document and the rather stark inaccuracies in its statistical data, it is at least debatable that it should have been enacted pursuant to the

the Bureau of Recreation, under the Department of Community Affairs, acts subject to the approval of the Commissioner of Community Affairs, *N.J.S.A.* 13:1B–15.1; the Veterans' Services Council, within the Department of Military and Veterans' Affairs, formulates comprehensive policies subject to the approval of the Commissioner, *N.J.S.A.* 13:1B–20, –21. Thus, it is clear that the legislative commitment to unifying natural resource entities under one authority whose responsibility it is to coordinate related efforts is as strong now as it was in the reorganization period surrounding the passage of the Constitution of 1947.

Administrative Procedure Act, *N.J.S.A.* 52:14B–4, as required under *Metromedia, Inc. v. Dir., Div. of Taxation,* 97 *N.J.* 313, 478 *A.*2d 742 (1984).[3] But even if that procedural obstacle could be overcome, the Bear Management Plan is simply not a statement of "comprehensive policies" within the meaning of *N.J.S.A.* 13:1B–28. By "comprehensive policies," the statute clearly envisions more than vague statements of general aspiration. Although a mission statement is an important part of a policy, the articulation of goals alone does not sufficiently direct the Fish and Game Council's actions to ensure that they correspond to the objectives of the DEP as a whole. On the contrary, the Fish and Game Council could enact essentially any regulation and portray it as within the ambit of "balancing bear population with safety" or "providing recreational and aesthetic opportunities for New Jersey citizens." That was not the intent of the statute that effectuated the unitary approach envisioned by the constitutionally mandated reorganization.

Instead, both contextual and commonsense considerations compel the conclusion that the statutory term "comprehen-

---

[3] The *Metromedia* standards, although originally formulated to distinguish rulemaking from adjudication, provide a test for when agency actions are subject to rulemaking procedures. *Woodland Private Study Group v. Dep't of Envtl. Prot.,* 109 *N.J.* 62, 67, 533 *A.*2d 387 (1987). Using the following factors either singly or in combination, an agency action must be rendered through rulemaking procedures when it

(1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.

[*Metromedia, supra,* 97 *N.J.* at 331–32, 478 *A.*2d 742.]

sive policies" refers to a thorough statement of guidelines that set forth not only end-point objectives but also the means that should be used to attain those ends. Comprehensive policies provide a detailed outline of the mandated approach to the topic at issue. In the case at hand, comprehensive policies should at least include the broad preservation goals discussed above, the tools at the Fish and Game Council's disposal to accomplish those goals, and most importantly, the factors that should be considered when determining which tools will be utilized.

The last category is the most complex and may include consideration, among other things, of the absolute size of the bear population, the number of harmful bear-human interactions and the fiscal and human resources available to carry out the stated goals. Most importantly, the comprehensive policies are to be formulated after consultation with the Commissioner and with his "approval" so that the singular and efficient approach to conservation and environmental protection contemplated by the 1947 Constitution can be effectuated.

Had the Fish and Game Council enacted policies that were approved by the Commissioner and that explained when it would pursue a bear hunt over other population control and conservation methods, and had the Fish and Game Council authorized the bear hunt in accordance with those policies, the Commissioner would have been powerless to refuse to issue or process applications for hunting permits. Indeed, once the Fish and Game Council acts in accordance with the DEP's overarching policies, the details of a hunt fall solely within its powers. *N.J.S.A.* 13:1B–30, –32. In the event that comprehensive policies are agreed on and a dispute arises between the Commissioner and the Fish and Game Council over whether a hunt or any other preservation or propagation methodology is justified, the comprehensive policies will provide the standard for adjudicating the issue.

Here, there are no approved policies in effect. All that is before us is the Fish and Game Council's claim that a hunt is justified by the size and activities of the bear population and the Commission-

er's countercontention that neither the statistics nor fiscal and human resources available warrant a hunt. In the absence of approved comprehensive policies, the Fish and Game Council could not promulgate regulations authorizing a hunt.

## VI.

The judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE, and RIVERA-SOTO—7.

*Opposed*—None.