**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4630-15T4

LEAGUE OF HUMANE VOTERS
OF NEW JERSEY, ANIMAL
PROTECTION LEAGUE OF
NEW JERSEY, DOREEN FREGA,
ANITA ROSINOLA, CATHERINE
MCCARTNEY, and ROBERTA
SHIELDS,

     Appellants,

v.

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION;
BOB MARTIN, in his capacity as
Commissioner of the NJDEP; DIVISION
OF FISH & WILDLIFE; DAVID CHANDA,
in his capacity as Director of the Division;
NEW JERSEY FISH & GAME COUNCIL;
and DAVID BURKE, in his capacity as
Acting Chair of the Council,

     Respondents.

_____

Argued November 9, 2018 – Decided  February 13, 2019

Before Judges Simonelli, Whipple and DeAlmeida.

On appeal from the adoption of 47 N.J.R. 2753(c) by the New Jersey Department of Environmental Protection.

Doris Lin argued the cause for appellants.

Jacobine K. Dru, Deputy Attorney General, argued the cause for respondents (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Jacobine K. Dru and Cristin D. Mustillo, Deputy Attorneys General, on the brief).

PER CURIAM

Appellants League of Humane Voters of New Jersey (LOHV), Animal Protection League of New Jersey (APLNJ), Doreen Frega, Roberta Shields, Catherine McCartney, and Anita Rosinola appeal from the November 16, 2015 adoption of the 2015 Comprehensive Black Bear Management Policy (CBBMP). Having reviewed the record, we affirm.

In 2015, the New Jersey Fish and Game Council (Council), an entity of the New Jersey Division of Fish and Wildlife (DFW) (a division of the New Jersey Department of Environmental Protection (NJDEP)), proposed certain amendments to the Fish and Game Code (Code), regulating black bear hunting. The amendments proposed a two-part bear hunt to take place in October and December, respectively, and adopted the 2015 CBBMP as an appendix to the Code. 47 N.J.R. 929(a) (May 18, 2015). The proposal was published in the

New Jersey Register, and after a sixty-day comment period and public hearing, during which the Council received over 10,000 written and oral comments, the rule was adopted.  47 N.J.R. 2753(c) (Nov. 16, 2015).  The final rule adoption was published in the New Jersey Register.  Ibid.

Appellants are all individuals and organizations who participated in the commenting process and filed emergent petitions with this court and the Supreme Court seeking a stay of the hunt pending their appeal.  LOHV and APLNJ are non-profit animal protection organizations, which work to enact animal-friendly legislation and work towards educating the public on nonviolent coexistence with animals.  Frega, Shields, McCartney, and Rosinola are individual residents of New Jersey who commented on the CBBMP during the public comment period.

There is a lengthy history of litigation regarding the decision to permit black bear hunting in New Jersey dating back to 1953 when the Council designated black bears as a game animal.  Ibid.  That history has been well chronicled and need not be restated here.  See U.S. Sportsmen's All. Found. v. N.J. Dep't of Envtl. Prot., 182 N.J. 461, 466 (2005) (U.S. Sportsmen's); Animal Prot. League of N.J. v. N.J. Dep't of Envtl. Prot., 423 N.J. Super. 549, 555-57 (App. Div. 2011) (Animal Prot. League).  In Animal Protection League, we

upheld the 2010 CBBMP and bear hunts were held in 2010, 2011, 2012, 2013, and 2014. See Animal Prot. League, 423 N.J. Super. at 554.

On March 3, 2015, the Council held a public meeting to present the proposed updates to the 2015 CBBMP. After a brief presentation and questions from the public, the Council approved the 2015 CBBMP. On April 10, 2015, the NJDEP Commissioner approved the proposed 2015 CBBMP. On May 18, 2015, the Council published a proposal in the New Jersey Register to make certain amendments to N.J.A.C. 7:25-5.6 and 5.24 and to adopt the 2015 CBBMP as an appendix. 47 N.J.R. 929(a). A public hearing was scheduled for June 2, 2015, and the original deadline for the submission of public comments was July 17, 2015. Ibid.

At the hearing, twenty-one members of the public presented oral comments and questions. APLNJ members attended and generally objected to the policy, the procedures governing the hunt, and the introduction of an October hunting season. Others generally objected to the hunt, the increase in permit numbers, the allowance of bow-hunting, and the methods used to collect data on bear complaints. No oral responses to the comments were provided at the hearing.

On November 16, 2015, the Council published the notice of rule adoption in the New Jersey Register. 47 N.J.R. 2753(c). The publication included the Council's responses to comments, which were grouped into forty-two objection categories corresponding to various parts of the 2015 CBBMP and rule amendments. Ibid. The proposed amendments to N.J.A.C. 7:25-5.6 included the following:

- The hunting season will consist of two six-day segments, one in October and one in December, to "allow for more consistent harvests, with essentially all bears available for hunting and with fewer complications due to weather events." 47 N.J.R. 929(a). Prior to this amendment, the bear hunting season ran concurrently with the firearm deer season. Ibid.

- A method to prematurely close the hunt was created. "If the harvest rate reaches [thirty] percent [of tagged bears] during the bear season, the season will be closed [twenty-four] hours from the day on which [that] harvest rate was achieved." Ibid. Prior to this amendment, the Council had the discretion to close the season early but was not required to do so at any point.

- Hunters can only use archery equipment and muzzleloaders during the hunt's October segment. Ibid. No archery was permitted prior to this amendment.

- Hunters are permitted to purchase one permit per segment, allowing for a new bag limit of two bears per hunter. Ibid. Previous rules imposed an annual one-bear-per-hunter limit.

- The boundaries of the Bear Management Zones (BMZs) were changed, and a new BMZ was created. Ibid.

- If the harvest rate at the end of the December segment is below twenty percent of tagged bears, the season will be extended for an additional four consecutive days. Ibid.

- The total number of permits for sale was increased from 10,000 to 11,000, and the permit lottery was ended. Ibid.; N.J.A.C. 7:25-5.6(a)(1).

- Archery is now a permissible method of harvest. 47 N.J.R. 929(a); N.J.A.C. 7:25-5.24.

On November 25, 2015, APLNJ wrote to the NJDEP Commissioner and the DFW requesting a stay of the hunt pending an appeal of the rule adoption. On December 1, 2015, APLNJ requested a stay of the 2015 hunt from the Council.[1] Unsuccessful, APLNJ filed an emergent application with this court, requesting a stay of the 2015 hunt pending the outcome of their appeal. We denied the emergent application. The Supreme Court also denied an emergent application, and a bear hunt has been held uninterrupted since.[2] Appellants appealed on June 29, 2016.

---

[1] The Council's response to this request was not provided as part of the record, but the letter imposed a deadline of December 2, 2015 for the Council's response.

[2] The 2015 bear hunt was held between December 7 and 12, 2015, and between December 16 and 19, 2015, and it resulted in a total harvest of 510 black bears. Div. of Fish & Wildlife, 2015 Black Bear Season Harvest Information, N.J. Dep't of Envtl. Prot., http://www.state.nj.us/dep/fgw/bearseas15_harvest.htm (last updated Sept. 6, 2016).

Appellants contend: (1) the CBBMP was not adopted in compliance with U.S. Sportsmen's, (2) no determination of a need for a bear hunt, pursuant to N.J.S.A. 13:1B-30, was made, (3) the Council was arbitrary and capricious in its rule adoption, (4) the rule was not adopted in compliance with the Administrative Procedure Act (APA), and (5) bow hunting is cruel. We will address, and reject, each argument.

I.

We apply the following standard of review. We will not overturn an administrative action "in the absence of a showing that it was arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence[.]" In re Carter, 191 N.J. 474, 482 (2007) (quoting Campbell v. Dep't of Civil Serv.,

---

636 bears were harvested in the 2016 bear hunt. Div. of Fish & Wildlife, 2016 Black Bear Season Harvest Information, N.J. Dep't of Envtl. Prot., http://www.state.nj.us/dep/fgw/bearseas16_harvest.htm (last updated Oct. 10, 2017).

The 2017 bear hunt produced a harvest of 409 bears. Div. of Fish & Wildlife, 2017 Black Bear Season Harvest Information, N.J. Dep't of Envtl. Prot., http://www.state.nj.us/dep/fgw/bearseas17_harvest.htm (last updated June 22, 2018).

The most recent bear hunt, in 2018, resulted in a harvest of 225 bears. Div. of Fish & Wildlife, 2018 Black Bear Season Harvest Information, N.J. Dep't of Envtl. Prot., http://www.state.nj.us/dep/fgw/bearseas18_harvest.htm (last updated Dec. 26, 2018).

39 N.J. 556, 562 (1963)). "A reviewing court 'must be mindful of, and deferential to, the agency's expertise and superior knowledge of a particular field.'" Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 158 (2018) (quoting Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 10 (2009)). Therefore, "we grant administrative agency action a 'strong presumption of reasonableness.'" Aqua Beach Condo. Ass'n v. Dep't of Cmty. Affairs, 186 N.J. 5, 16 (2006) (quoting City of Newark v. Nat. Res. Council, 82 N.J. 530, 539 (1980)).

An agency's findings of fact "are considered binding on appeal when supported by adequate, substantial and credible evidence[.]" In re Taylor, 158 N.J. 644, 656 (1999) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974)). "Even if we might have chosen a different course, the agency's decision must be affirmed if supported by the record." In re Visiting Nurse Ass'n of Sussex Cty., Inc., 302 N.J. Super. 85, 95 (App. Div. 1997). "We are not free to substitute our judgment as to the wisdom of a particular agency action so long as it is statutorily authorized and not otherwise defective as arbitrary and capricious." Ibid. Ultimately, we will not "micromanage" an agency, but recognize that unless the agency's action is inconsistent with its

legislative authority, we will act with restraint and not intervene. In re Failure by the Dep't of Banking & Ins., 336 N.J. Super. 253, 262 (App. Div. 2001).

II.

We turn to appellants' first argument that the Council did not meet the requirements established by U.S. Sportsmen's when adopting the 2015 CBBMP. Appellants assert the 2015 CBBMP did not set "end-point goals" or describe the factors to be considered when choosing the tools at DFW's disposal to be utilized. We reject both arguments because the Council set an identifiable harvest rate and provided a list of its bear management tools with discussion of how certain factors influence use of certain tools.

Pursuant to N.J.S.A. 13:1B-28, the "Council shall, subject to the approval of the commissioner, formulate comprehensive policies for the protection and propagation of fish, birds, and game animals[.]" Our Supreme Court clarified the definition of a "comprehensive policy," explaining it must "set forth not only end-point objectives" but also "should at least include . . . broad preservation goals . . ., the tools at the . . . Council's disposal to accomplish those goals, and most importantly, the factors that should be considered when determining which tools will be utilized." U.S. Sportsmen's, 182 N.J. at 478.

9

Here, the Council set the following objectives for the management of the State's black bear population:

- Sustain a robust black bear population as part of [New Jersey's] natural resource base.

- Advance the scientific understanding of black bears.

- Educate the public about common-sense practices that reduce the risk of negative black bear behavior on humans, their homes, their property, and their communities.

- Enforce the law on bear feeding and garbage containment.

- Use lethal control on high-risk, dangerous bears.

- Utilize non-lethal aversive conditioning techniques on nuisance bears.

- Reduce and stabilize the population at a level commensurate with available habitat and consistent with reducing risk to public safety and property.

- Ensure that regulated hunting remains a safe and effective management tool to provide recreation and control [New Jersey's] black bear population.

[47 N.J.R. 2753(c).]

The 2015 CBBMP establishes an "integrated black bear management strategy [that] includes educating people about black bear ecology, recommending human behavioral adjustments while in bear range, enforcing laws that minimize human-bear conflicts, taking action against dangerous and

nuisance bears, monitoring the bear population and implementing population control." Ibid. For each of these identified parts of the strategy, the 2015 CBBMP includes methods available to achieve the stated goals, the history of each method's use and effectiveness, and recommended methods to be prioritized by the DFW. Particularly, the Council justifies the need for regulated hunting by citing the bear population's sustainable-yield capacity and the correlation between bear hunting seasons and a reduction in complaints by explaining how alternative methods of population management, such as relocation and fertility control, are unfeasible. This policy satisfies U.S. Sportsmen's and appellants' argument is, therefore, meritless.

Appellants' contention that the Council set no end-point goals is also meritless. The Council set an identifiable harvest-rate threshold of twenty-to-thirty percent of the black bear population based on the population's sustained-yield capabilities, as well by looking to the practices of other states. For the first time, the Council established an in-season mechanism by which to close the bear hunt if the harvest rate exceeds thirty percent. Contrary to appellants' assertion, the Council was not required to identify a specific number it thought the black bear population needed to be reduced by. Rather, the Council

appropriately identified an acceptable range of population reduction and provided the public with several metrics it uses to evaluate that goal.

## III.

We also reject the arguments that the Council did not establish a need for the bear hunt and the Council was arbitrary and capricious in its rule adoption.

## A.

In 2011, we addressed similar challenges to the 2010 CBBMP. Animal Prot. League, 423 N.J. Super. at 554. We also discussed a number of other issues, including but not limited to: "education; control of human-derived food; research and analysis of the State's black bear population; analysis of the State's available black bear habitat; . . . [and] lethal and non-lethal means of controlling bears to reduce the nuisances they create and their threat to human safety[.]" Id. at 555-56.

In Animal Protection League, the appellants, several of whom are appellants herein, argued the Council acted arbitrarily and capriciously by enacting the bear hunt rules. Id. at 557-58. Specifically, they asserted the Council manipulated bear complaint data; did not consider carrying capacities; "acted arbitrarily and capriciously with regard to predicting, collecting, reporting and reacting to information regarding the potential for over-harvesting

A-4630-15T4

the bears, particularly pregnant females"; failed to consider the risks of hunting; and arbitrarily dismissed the use of non-lethal bear population control methods. Id. at 563-70.

Appellants in Animal Protection League relied on a report by Rutgers University Professor Edward A. Tavss to assert the Council's data was inflated by double counting bear complaints. Id. at 563. They also previously suggested the Council improperly "includ[ed] in their 2009 figures complaints from previously unused sources, . . . thereby allegedly making comparison of its 2009 figures to prior years' figures 'impossible.'" Ibid. Further, they argued the Council ignored their own data showing bear hunting increases the bear population, not decreases it. Id. at 565. We rejected those arguments one by one, concluding the Council's decision to enact the 2010 CBBMP was "well-supported by scientific data, and [such] complaints amount to a disagreement with the data and the conclusions respondents drew from them." Id. at 566.

Here, appellants bring arguments largely unchanged since the challenge to the 2010 CBBMP. They argue the Council inflated bear complaint data, improperly included complaints from previously unused sources, excluded unfavorable data, and failed to conduct carrying capacity studies. They assert the Council misrepresented information regarding the sex ratio of harvested

13

bears, arbitrarily claimed a December hunt would protect pregnant female bears, and did not consider the effects of overharvesting. They also claim that the Council's own data shows hunting causes an increase in the bear population.

Appellants again rely on the same Tavss[3] report and assert the Council considered over 300 duplicative complaints and included complaint data from improper sources. The Tavss report claimed the surge in the number of complaints in 2008 and 2009 were statistical outliers caused by the sudden inclusion of new complaint collection sources, including from police departments across the state and the NJDEP's Communication Center. Once Tavss removed the alleged duplicate and mischaracterized complaints and the complaints taken by the new sources, he concluded the number of bear complaints actually decreased between 1999 and 2009. Hence, Tavss found no

---

[3] Professor Edward A. Tavss, Ph.D., according to the title page of his study, is a professor at Rutgers University in the Department of Chemistry and Chemical Biology. Chemical biology is the "the application of chemistry to the study of molecular events in biological systems." Dep't of Chemistry & Chem. Biology, Chemical Biology, Cornell Univ., http://chemistry.cornell.edu/chemical-biology (last visited Jan. 15, 2019). Appellants do not provide a CV for Professor Tavss, and he is not listed, as of the date of argument, on the Rutgers University website as faculty of any kind.

The Tavss report is included in the appendix, but is not dated, and does not appear to have been published in a scientific journal or to have been peer reviewed.

actual increases in bear complaints and urged non-lethal bear control methods would render a bear hunt unnecessary. However, as we found in <u>Animal Protection League</u>, the NJDEP Commissioner debunked the Tavss report in 2010 and summarized the results of the audit, saying:

> [a]fter identifying [the] reports that represent potential double-counting of same-day/same-location incidents, the Department concluded that such double-counting may affect <u>only a fraction of reported incidents</u>. Specifically, potential double-counting may have occurred in only [twenty-four] out of 2,844 recorded incidents (or .83%) in 2008, and only [thirteen] out of 3,005 recorded incidents (or .43%) in 2009, resulting primarily from duplication of incidents reported both to the Department and to local police departments.
>
> [<u>Id.</u> at 564 (first and second alterations in original) (emphasis added).]

The NJDEP Commissioner concluded Professor Tavss's conclusions were unfounded. Rather, the Council's own data, in 2010, showed the black bear population was robust and expanding and negative bear/human interactions were increasing. The <u>Animal Protection League</u> court regarded the Council's rejection of the Tavss Report as reasonable under the circumstances and therefore entitled to deference. <u>Id.</u> at 565.

Like in <u>Animal Protection League</u>, the Tavss Report still does not discredit the Council's complaint collection methodology. Rather, we defer to the

Council's finding that the ebb and flow of complaint data is related to the harvest rate, as evidenced by the Council's response to a comment:

> After the 2003 and 2005 bear hunting seasons, bear complaints in 2004 and 2006 fell consistent with the decrease in the bear population. However, <u>after the 2004 decrease in complaints, levels in 2005 increased before the impending 2005 season</u> occurred . . . . Similarly, complaint levels dropped between 2011 and 2013 as a result of the 2010 through 2012 bear seasons. <u>After the 2013 bear season, complaint numbers rose significantly in 2014 consistent with the increase in the bear population</u>.
>
> [47 N.J.R. 2753(c) (emphasis added).]

Thus, the Council acted reasonably in assessing and adopting the complaint data and we reject the assertion this was an arbitrary or capricious decision.

We similarly reject appellants' claim that the Council did not properly consider both biological and cultural carrying capacity in the 2015 CBBMP.[4] In response to a comment claiming bears self-regulate, the Council stated the bear population in certain northwest counties (BMZs 1-4) exceeds the area's cultural carrying capacity. Ibid. BMZs 1-4 are home to roughly 3500 bears and account

---

[4] Biological carrying capacity is the "maximum number of animals an environment can support without damage to the environment while maintaining the animals in a healthy and vigorous condition." Animal Prot. League, 423 N.J. Super. at 567 n.10. Cultural carrying capacity "is the number of bears that can co-exist compatibly with the local human population in a given area." 47 N.J.R. 2753(c).

for a substantial share of the 1951 complaints made in 2014. Ibid. The Council estimates there is a density of two-to-three bears per square mile in certain northwest counties, far greater than the one bear per 2.5 square miles recommended by the 1997 CBBMP. Ibid.

Appellants take these data and run with them. They point to the 1951 complaints filed in 2014 and compare that figure to the total State population to suggest the statewide bear-complaint-to-human ratio actually undermines the Council's density calculations.[5] However, neither bears nor humans are equally dispersed throughout the State. Northwest counties also deal with bears crossing the Pennsylvania and New York borders. Therefore, the Council's conclusion that bear density is more problematic in certain northwest counties, as compared to the rest of the State, was reasonable considering it was based on DFW research and years of specialized black bear expertise.

Moreover, we already rejected the notion that the need for a hunt can only be based on the bear population exceeding the biological or cultural carrying

---

[5] Appellants also fault the Council for not preparing a biological carrying capacity study. However, in Animal Protection League, we explained it was reasonable to defer to the Council's judgment that managing any wildlife species based on biological carrying capacity was ineffective and irresponsible. 423 N.J. Super. at 567, 571. Considering appellants offer no new reason to dispute this conclusion, we do not depart from it.

A-4630-15T4

capacity and discern no reason to change our decision. In <u>Animal Protection League</u>, we were unpersuaded by the argument:

> respondents may only employ a hunt as a last resort <u>when necessary to control the bear population or reduce bear complaints</u>. However, . . . the Council's enabling statutes permit it to consider "public recreation" when determining if and when game animals may be hunted, indicating that there is no requirement that the hunt be a last resort.
>
> [423 N.J. Super. at 571 (emphasis added) (citations omitted).]

Even if appellants' carrying capacity argument had merit, the 2015 CBBMP justifies the need for a hunt by identifying the Council's population management goals and ruling out alternative methods of population control as ineffective compared to hunting.

B.

Appellants next argue the Council misrepresented sex ratio data from the 2003 hunt. In 2003, sixty-four percent of bears harvested were female, while thirty-six percent were male. But in response to a 2015 comment, the Council explained the sex and age structure of the 2003 harvest "matched that of bears captured during research and control activities." 47 N.J.R. 2753(c). The 2004 bear status report reflects forty-two percent of the bears captured for research

and control activities in 2003 were male, while fifty-seven percent were female. Appellants argue this discrepancy reveals the Council's bad faith.

We disagree because the answer was given in response to a concern about trophy hunting, not sex ratio data. The Council explained a trophy hunt would only target adult bears, whereas under the CBBMP, bears of any sex or age can be hunted. The Council's response merely explained how the variance in the harvested population was useful for data collection purposes, and was not, as appellants suggest, representing that the sex ratio of the 2003 hunt was something other than what was recorded. This statement was not made in bad faith nor was it arbitrary and capricious.

Appellants also argue the Council's reasoning that "[t]he hunting season structure of 2003, 2005, and 2010 through 2014 was timed to be conservative, restricting harvest to bears that had not yet entered winter dens and also protecting pregnant females" is directly contradicted by the reported harvest sex ratios. Ibid. However, this statement is also taken out of context. First, the statement only explained why the Council decided to introduce a new October segment of the bear hunt. Second, because pregnant black bears have a tendency to enter their dens first, usually in mid-November, it was not arbitrary or

capricious to reason that a black bear hunt held in December would grant enhanced protection to pregnant female black bears.

## C.

We also reject the argument that the Council's harvest rate limits are arbitrary and capricious. New Jersey's black bear population was found to be "robust and viable" with a "high reproductive and survival rate." Ibid. The Council explained that regulated hunting is an effective method of managing the population and is responsible considering the amount of complaints and agricultural damage. Therefore, the Council concluded "black bear populations can sustain annual harvest rates of [fifteen-to-twenty percent] with little or no decline in population size." Ibid. To ensure the harvest stays within a sustainable parameter, DFW is obliged to close the season if the harvest rate reaches thirty percent of tagged bears. N.J.A.C. 7:25-5.6(a). This rate is supported by scientific research and is reasonable considering the historical bear population data provided by the Council. Therefore, the harvest rate is not arbitrary or capricious.

## D.

Appellants next assert the Council's own data show that bear hunts cause an increase in the state's bear population. To support this argument, they point

A-4630-15T4

to a chart from the 2005 CBBMP predicting the bear population in 2009 would be 2694 if hunting was prohibited. According to the 2010 CBBMP, the Council estimated the 2009 black bear population to be 3438. Appellants say this proves a bear hunt causes an increase in the overall population.

However, appellants mistake correlation for causation. The Council found both the bear population and complaints were reduced after the 2003, 2005, 2010, 2011, and 2012 hunting seasons. The Council attributed the 2013 population increase to declining harvest rates. As such, the argument that bear hunts cause an increase in the bear population is meritless.

IV.

Appellants assert the Council violated the APA, N.J.S.A. 52:14B-1 to -15. Specifically, appellants allege: the Council failed to respond to questions at the public hearing on the CBBMP, failed to publish all the amendments to the Code in the New Jersey Register, failed to adopt criteria to approve permits for fertility control research, and failed to respond, or did so disingenuously, to many comments. We reject these claims and conclude the APA was not violated.

To be valid, a rule must be adopted in "substantial compliance" with the APA. N.J.S.A. 52:14B-4(d). Prior to adopting or amending a rule, an agency

A-4630-15T4

must provide notice of its intended action and "[a]fford all interested persons a reasonable opportunity to submit data, views, comments, or arguments, orally or in writing." N.J.S.A. 52:14B-4(a)(1), (3). Public comments should be "given a meaningful role" in the rule adoption process. In re Adoption of Rules Concerning Conduct of Judges of Comp., 244 N.J. Super. 683, 687 (App. Div. 1990). In response, the agency must "make available . . . through publication . . . a report listing all parties offering written or oral submissions concerning the rule, summarizing the content of the submissions and providing the agency's response to the data, views, comments, and arguments contained in the submissions." N.J.S.A. 52:14B-4(a)(4).

Appellants' first contention is that the Council did not respond to oral comments at the public meeting on June 2, 2015. The Council acknowledges it did not provide contemporaneous oral responses, but instead responded to the comments in the adoption document. The APA requires "[a]t the beginning of each hearing . . . the agency . . . shall present a summary of the factual information on which its proposal is based, and shall respond to questions posed by any interested party." N.J.S.A. 52:14B-4(g). In Animal Protection League, we explained that the Council's failure to contemporaneously respond to questions, and instead respond to oral comments in the published summary, was

not fatal to adoption of the regulation. 423 N.J. Super. at 577. Here, the Council conducted the public meeting in the same way by fielding comments, not giving substantive answers, but making it clear the proposed CBBMP was available. The Council then responded to the comments and concerns in the written summary contained in the rule adoption. Like in Animal Protection League, the Council held the public meeting in substantial compliance with the APA.

Next, appellants take issue with the Council's use of "(No change)" in its publication of the revised version of N.J.A.C. 7:25-5.6. For example, under N.J.A.C. 7:25-5.6(a)(1)(iv)(1) in the rule adoption document, instead of reproducing the regulation's text, the Council includes "(No change)." 47 N.J.R. 2753(c). Appellants argue this means the Council failed to publish the adopted regulation. But nothing in the APA requires an agency to re-publish the entirety of an amended regulation. As the Council points out, agencies frequently use "(No change)" to communicate the provision is left untouched and it is an efficient way to be clear about what language the regulation is altering. Thus, the Council's omission of unchanged language does not mean it fell out of substantial compliance with the APA.

Appellants take issue with the Council's support of further fertility control research and argue this was impermissible because the Council did not re-adopt

the regulations relating to fertility control permits, N.J.A.C. 7:25-5.37(a). This argument is unpersuasive because amendment of one regulation does not open the door to criticize all other rules it interacts with. See Am. Cyanamid Co. v. State, Dep't of Envtl. Prot., 231 N.J. Super. 292, 314 (App. Div. 1989). Moreover, the APA only requires the "agency [to] consider fully all written and oral submissions respecting the proposed rule[.]" N.J.S.A. 52:14B-4(a)(3).

Finally, appellants argue, as they did in regard to the 2010 CBBMP, that the Council failed to respond, or did so disingenuously, to several comments. The Council fielded nearly 10,000 comments concerning the 2015 CBBMP. In the rule adoption, the Council published the name of each commenter, grouped the comments in forty-two question-type categories, and provided responses to each category of comments. Many of the responses were thorough and directly addressed the commenters' concerns. This includes responses to several of the comments appellants say were ignored. As for the claim that some responses were disingenuous, we view appellants' argument here as nothing more than disagreement with reasonable and supported agency opinions. Thus, we discern no APA violation.

Finally, we reject appellants' argument that the apprentice hunting license allows untrained persons to hunt bears, as well as appellants' assertion that the Council needed to consider the humaneness of bow-hunting before permitting it. First, apprentice hunters are precluded from participating in any black bear hunt. See N.J.A.C. 7:25-5.6(a)(1) ("Apprentice licenses are not valid for the taking of bear."); see also N.J.A.C. 7:25-5.1(d)(7) ("A holder of an apprentice license may hunt in any open season . . . except as provided at N.J.A.C. 7:25-5.6 . . . ."). Moreover, the apprentice hunter license regulations are not being challenged. See Am. Cyanamid Co., 231 N.J. Super. at 314.

Second, appellants only dispute the cruelness of bow-hunting but not its efficacy or safety. Yet, appellants offer no argument as to why it was arbitrary or otherwise unreasonable for the Council not to consider the cruelness of bow-hunting. Therefore, we defer to the Council's judgment.

We wholly reject appellants' challenge to the 2015 CBBMP. After careful review of the record, none of appellants' arguments are capable of showing the Council acted arbitrarily or failed to substantially comply with the APA. Even though appellants strongly oppose the Council's findings and policies, "simple disagreement . . . is insufficient to overcome the presumption of reasonableness

ascribed to [the agency's] findings." Animal Prot. League, 423 N.J. Super. at 562.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4630-15T4