934 A.2d 52

NEW JERSEY ANIMAL RIGHTS ALLIANCE AND THE BEAR ED-
UCATION AND RESOURCE GROUP, APPELLANTS v. NEW
JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION
("NJDEP"), BRADLEY M. CAMPBELL, IN HIS CAPACITY AS
COMMISSIONER OF NJDEP; NJDEP, DIVISION OF FISH &
WILDLIFE; MARTIN J. MCHUGH, IN HIS CAPACITY AS DI-
RECTOR OF THE DIVISION; NJDEP, DIVISION OF FISH &
WILDLIFE, FISH & GAME COUNCIL; AND ERNEST P. HAHN,
IN HIS CAPACITY AS CHAIR OF THE COUNCIL, RESPON-
DENTS, AND SAFARI CLUB INTERNATIONAL, SAFARI CLUB
INTERNATIONAL FOUNDATION, RESPONDENTS–INTERVE-
NORS, AND U.S. SPORTSMEN'S FOUNDATION, JOHN REGA-
LO, AND ANTHONY CALI, RESPONDENTS–INTERVENORS.

NEW JERSEY STATE FEDERATION OF SPORTSMEN'S CLUBS,
INC.; U.S. SPORTSMEN'S ALLIANCE FOUNDATION; SAFARI
CLUB INTERNATIONAL; SAFARI CLUB INTERNATIONAL
FOUNDATION, APPELLANTS v. NEW JERSEY DEPARTMENT
OF ENVIRONMENTAL PROTECTION; LISA JACKSON, IN
HER CAPACITY AS COMMISSIONER OF THE NJDEP, NEW
JERSEY DIVISION OF FISH & WILDLIFE; DAVID CHANDA,
IN HIS CAPACITY AS DIRECTOR OF THE DIVISION, RE-
SPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued September 4, 2007—Decided September 27, 2007.

Before Judges STERN, COLLESTER and SABATINO.

*Doris Lin,* argued the cause for appellants (A–1463–05T3) and as amicus curiae (A–1382–06T3) Jersey Animal Rights Alliance and the Bear Education and Resource Group.

*Anna M. Seidman* of the Washington D.C. bar, admitted pro hac vice, argued the cause for respondents-intervenors (A–1463–05T3) Safari Club International and Safari Club International Foundation (*Law Offices of John C. Lane,* attorneys; *Peter C. Bobchin,* of counsel; *Ms. Seidman,* on the brief).

*Anna M. Seidman* of the Washington D.C. bar, admitted pro hac vice, and *James H. Lister* (*Birch, Horton, Bittner and Cherot*) of the Washington D.C. bar, admitted pro hac vice, jointly argued the cause for appellants (A–1382–06T3) New Jersey State Federation of Sportsmen's Clubs, Inc., U.S. Sportsmen's Alliance Foundation, Safari Club International, and Safari Club International Foundation (*Scarinci & Hollenbeck,* attorneys; *Ms. Seidman, Mr. Lister,* and *Douglas S. Burdin* of the Washington D.C. bar, admitted pro hac vice, of counsel; *Thomas J. Cafferty,* on the brief).

*Dean Jablonski,* Deputy Attorney General, argued the cause for respondents (A–1463–05T3 and A–1382–06T3) New Jersey De-

partment of Environmental Protection, Bradley M. Campbell, Martin J. McHugh, Ernest P. Hahn, Lisa Jackson and David Chanda (*Anne Milgram*, Attorney General, attorney; *Patrick DeAlmeida*, Assistant Attorney General, of counsel; *Mr. Jablonski*, on the brief).

The opinion of the court was delivered by

STERN, P.J.A.D.

The New Jersey Animal Rights Alliance and the Black Bear Education and Resource Group ("NJARA") appeal from the approval of the 2005 Comprehensive Black Bear Management Policy ("CBBMP") on November 14, 2005 by the then-Commissioner of the Department of Environmental Protection ("DEP"). The CBBMP was adopted in response to the Supreme Court's opinion in *U.S. Sportsmen's Alliance Found. v. N.J.D.E.P.*, 182 *N.J.* 461, 867 *A.*2d 1147 (2005), and NJARA unsuccessfully sought a stay of the 2005 bear hunt following adoption of the CBBMP. In November 2006, the New Jersey State Federation of Sportsmen's Clubs, Inc., U.S. Sportsmen's Alliance Foundation, Safari Club International, and Safari Club International Foundation ("the Sportsmen") filed a challenge to the new DEP Commissioner's failure to implement the process under the CBBMP to enable a 2006 bear hunt. Subsequently, on November 15, 2006, the Commissioner withdrew her approval of the CBBMP. The Sportsmen sought emergent relief before us to enjoin the Commissioner's withdrawal and reinstitute the hunt. We denied emergent relief as did the Supreme Court. In March 2007, on motion of the DEP, we remanded the pending appeals from the 2005 and 2006 final administrative decisions to the agency for further consideration, but retained jurisdiction and ordered briefing of all outstanding issues regarding 2005 and 2006 decisions as well as any action taken on the remand.

During the remand, both the Commissioner and the Fish and Wildlife Council ("Council") concluded that there should be no bear hunt in 2007, although no formal action was taken in that

regard by rulemaking. NJARA now challenges the adoption of the 2005 CBBMP and the Sportsmen challenge the Commissioner's November 2006 withdrawal of approval of the 2005 and 2006 bear hunts. Both parties assert that the respective actions were arbitrary and capricious. NJARA also argues that the CBBMP was not properly adopted under the Administrative Procedure Act ("APA") and that the DEP violated the public trust doctrine. The Sportsmen contend that the Commissioner acted outside of her statutorily delegated authority in withdrawing the CBBMP, and contend that as a rule was properly adopted under the APA, it could not be unilaterally vacated by the new Commissioner.

We invalidate the 2005 CBBMP because the APA was not honored, as was required, to validly promulgate the CBBMP. Therefore, all agency actions taken subsequent to the adoption of the CBBMP were invalid, since the initial 2005 CBBMP did not lawfully exist. The APA must be followed in promulgating the CBBMP.[1]

On February 28, 2005, in *U.S. Sportsmen's Alliance Foundation,* the Supreme Court held that, as a mandatory requisite to a hunt, the Council had to adopt comprehensive policies regarding bear hunts that were to be made in consultation with the DEP Commissioner and approved by him or her. 182 *N.J.* at 478–79, 867 *A.2d* 1147. The Council thereafter drafted the 2005 CBBMP, which promulgated a policy permitting bear hunts in 2005 through 2010. *N.J.A.C.* 7:25–5.6(a); *N.J.A.C.* 7:25–5.27(a); 37 *N.J.R.* 1959(a) (June 6, 2005); 37 *N.J.R.* 3657(a) (September 19, 2005). The then-Commissioner of DEP approved the CBBMP on November 14, 2005 by sending a letter to the then-Chair of the Council.

---

[1] The parties seemed to agree at oral argument before us that, if a new CBBMP is not adopted in the reasonably foreseeable future, an action can be brought before us premised on administrative inaction. *See R.* 2:2–3(a)(2); *see also Infinity Broadcasting Corp. v. N.J. Meadowlands Com'n,* 187 *N.J.* 212, 223, 901 *A.2d* 312 (2006); *Central R. Co. v. Neeld,* 26 *N.J.* 172, 184–85, 139 *A.2d* 110, *cert. denied,* 357 *U.S.* 928, 78 *S.Ct.* 1373, 2 *L.Ed.2d* 1371 (1958).

On its face, *N.J.S.A.* 13:1B–30 gives the Council sole authority to establish a Fish and Game Code to regulate hunting and fishing of "fresh water fish, game birds, game animals, and fur-bearing animals[.]" *N.J.S.A.* 13:1B–30. The statute requires the adoption of "regulations," and provides that "[t]he regulations so established shall be called the State Fish and Game Code." *Ibid.*

The Code is codified in subchapter five of *N.J.A.C.* 7:25. *See* historical note to *N.J.A.C.* 7:25–5. It now provides for a bear hunt to take place "concurrent[ly] with the six-day firearm deer season." *N.J.A.C.* 7:25–5.6(a). The current Game Code, for the years 2006–11, sets the 2007 hunt for December 3–8. *N.J.A.C.* 7:25–5.27(a); *N.J.A.C.* 7:25–5.6(a). However, since August 2005 the Code also provides that the season for black bear is "closed" "until the Commissioner approves a comprehensive policy for the protection and promulgation of black bear." *N.J.A.C.* 7:25–5.6(a). *See also* 37 *N.J.R.* 1959(a); 37 *N.J.R.* 3681.

On September 6, 2005, the Division of Fish and Wildlife published a "Notice of Opportunity for Public Comment on the New Jersey Comprehensive Black Bear Management Policy" in the *New Jersey Register.* 37 *N.J.R.* 3458(a) (Sept. 6, 2005). The notice announced a short overview of the proposal and stated that the CBBMP was "subject to the approval of the Commissioner of the Department." *Ibid.* It also announced that the text of the CBBMP was "available on the Division of Fish and Wildlife's website" and gave the web address. *Ibid.* The notice then stated that a public hearing on the CBBMP would be held on September 21, 2005 and gave the time and location of the hearing. *Ibid.* A public comment period, extending until October 6, 2005, was also announced, and the notice gave a mailing address for comments and said they could also be submitted using the Division's website. 37 *N.J.R.* 3458(a) (Sept. 6, 2005). As stated above, the Commissioner approved the 2005 CBBMP by letter to the Chairman of the Council on November 14, 2005 after reviewing the policy, which the Commissioner stated was "revised after extensive public comments and a public hearing[.]" In the November 21, 2005 issue of

the *New Jersey Register,* the Division of Fish and Wildlife posted a "Notice of Availability of the New Jersey Comprehensive Black Bear Management Policy and Decision Document[,]" stating that an electronic copy of the 2005 CBBMP was available on the Division's website, and a hard copy could be obtained via regular mail for $5.00 from the address published in the notice. 37 *N.J.R.* 4474(a) (Nov. 21, 2005).[2]

The Commissioner's required approval of the CBBMP stems from the statutory requirement that "the Fish and Game Council shall, subject to the approval of the commissioner, formulate comprehensive policies for the protection and propagation of fish, birds, and game animals. . . ." *N.J.S.A.* 13:1B–28. In *U.S. Sportsmen's Alliance* the Supreme Court clarified the interrelated roles of the Council and the Commissioner:

> [T]he [Council] clearly does not function as a completely autonomous body, unaccountable to the department head. Rather, the Commissioner must approve the [Council's] comprehensive policies. It is the Commissioner's approval that, in turn, insures that those policies comport with department-wide goals for environmental protection.
>
> [*U.S. Sportsmen's Alliance Found. v. N.J. Dep't of Envtl. Prot.,* 182 *N.J.* 461, 474, 867 *A.*2d 1147 (2005).]

Specifically regarding the bear hunt, the Court stated, "the [Council's] ability to authorize a bear hunt is subject to the statutory condition precedent of the Commissioner's earlier approval of the very comprehensive policies governing the propagation of black bears." *Id.* at 476, 867 *A.*2d 1147; *see also id.* at 478, 867 *A.*2d 1147 ("[t]he comprehensive policies are to be formulated after consultation with the Commissioner and with his 'approval' so that the singular and efficient approach to conservation and environmental protection contemplated by the 1947 Constitution can be effectuated.").

---

[2] *See also N.J.A.C.* 7:25–5.6(a) (2006) (changes from the 2005–06 Game Code to the 2006–2011 Game Code did not impact hunt authorization powers); 39 *N.J.R.* 591 (Feb. 20, 2007) (proposed changes to the 2006–2011 Game Code); 39 *N.J.R.* 3338–39 (Aug. 6, 2007) (adopted changes to the 2006–2011 Game Code).

The Commissioner's oversight authority exists despite the Council's statutorily-granted independent authority to create the Fish and Game Code and to "[e]stablish, extend, shorten or abolish open seasons and closed seasons." *N.J.S.A.* 13:1B–30; *N.J.S.A.* 13:1B–32(a). This is because "the entire statutory scheme was intended to create a unified approach to conservation and environmental protection under the authority of the Commissioner." *U.S. Sportsmen's Alliance Found., supra*, 182 *N.J.* at 476, 867 *A.*2d 1147.

Moreover, the Commissioner's authority is not limited to approving CBBMPs; he or she is authorized to intervene when the Council fails to follow its own comprehensive policies:

> [a]lthough the [Council] may act without day-to-day veto by the Commissioner, its actions exist within a larger universe of comprehensive environmental policies. If it does not act in accord with those policies, the Commissioner is empowered to intervene.
>
> [*Ibid.*]

However, the Court made the above authorization of action by the Commissioner narrow by giving examples of when the Commissioner would be barred from acting, including if

> the Fish and Game Council enacted policies that were approved by the Commissioner and that explained when it would pursue a bear hunt over other population control and conservation methods, and had the Fish and Game Council authorized the bear hunt in accordance with those policies, the Commissioner would have been powerless to refuse to issue or process applications for hunting permits. Indeed, once the Fish and Game Council acts in accordance with the DEP's overarching policies, the details of a hunt fall solely within its powers.
>
> [*Id.* at 478, 867 *A.*2d 1147.]

The Supreme Court further provided that, in a dispute between the Commissioner and the Council "over whether a hunt or any other preservation or propagation methodology is justified, the comprehensive policies will provide the standard for adjudicating the issue." *Ibid.*

■ It is true, as the Sportsmen argue, that in 2005 the Council and Commissioner agreed on a CBBMP policy, suggesting that the Commissioner was "powerless" to unilaterally change it. *Ibid.* However, the issue that must be decided is whether that policy

was lawfully adopted. Stated otherwise, in order to determine whether the Commissioner's November 15, 2006 withdrawal of approval of the 2005 CBBMP was proper, we must decide whether the 2005 CBBMP had to be adopted in accordance with the APA.

According to the definitions section of the APA, an

"Administrative rule" or "rule," when not otherwise modified, means each agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes the amendment or repeal of any rule, but does not include: (1) statements concerning the internal management or discipline of any agency; (2) intra-agency and interagency statements; and (3) agency decisions and findings in contested cases.

[*N.J.S.A.* 52:14B–2(e).]

The phrase an "intra-agency and interagency statements" was defined by the Court as a means for "the executive branch to communicate with itself and with other units of government without delay or bureaucratic entanglement." *Woodland Private Study Group v. N.J. Dep't of Envtl. Prot.*, 109 *N.J.* 62, 73, 533 *A.2d* 387 (1987) (citations omitted). The Court recently further developed that definition:

Where a legally countenanced right of a party is threatened by an internal communication of an agency, rulemaking procedure must be followed. What constitutes an interest that cannot be abridged without rulemaking procedure is not easily defined. The interest alleged must ultimately be legitimate [and] of justifiable concern....

The inquiry is whether the agency's interest in streamlined procedure is outweighed by the importance of the interests that are affected. Generally where the interest implicated is legitimate, the balance will tilt in favor of notice and hearing for internal actions that have a substantial impact on that interest. In light of the foregoing we can define an intra-agency statement as (1) a communication between agency members that (2) does not have a substantial impact on (3) the rights or legitimate interests of the regulated public.

[*Univ. Cottage Club v. N.J. Dep't of Envtl. Prot.*, 191 *N.J.* 38, 55, 921 *A.2d* 1122 (2007) (quoting *Woodland Private Study Group, supra,* 109 *N.J.* at 74–75, 533 *A.2d* 387).]

In determining if a "contested case" exists under the third exception to the definition of "rule", the court must ask, "(1) is a hearing required by statute or constitutional provision; (2) will the hearing adjudicate rights, duties, obligations, privileges, benefits or other legal relations; and (3) are specific parties involved

rather than large segments of the public?" *Div. of State Police v. Maguire*, 368 *N.J.Super.* 564, 573, 847 *A.*2d 614 (App.Div.), *certif. denied*, 181 *N.J.* 545, 859 *A.*2d 690 (2004).

The Supreme Court has also explained that "[r]ulemaking is a legislative-type function that usually involves policy judgments of widespread application within the agency's regulatory sphere." *In re Issuance of Permit by Dep't of Envtl. Prot.*, 120 *N.J.* 164, 171, 576 *A.*2d 784 (1990). In *Metromedia, Inc. v. Director, Division of Taxation*, the Court explained factors that classify an agency action as a rule:

> an agency determination must be considered an administrative rule when all or most of the relevant features of administrative rules are present and preponderate in favor of the rule-making process. Such a conclusion would be warranted if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy. These relevant factors can, either singly or in combination, determine in a given case whether the essential agency action must be rendered through rule-making or adjudication.
>
> [*Metromedia, Inc. v. Dir., Div. of Taxation*, 97 *N.J.* 313, 331–32, 478 *A.*2d 742 (1984); *see also U.S. Sportsmen's Alliance Found., supra*, 182 *N.J.* at 477 n. 3, 867 *A.*2d 1147.]

In *U.S. Sportsmen's Alliance Foundation*, the Court stated that "it is at least debatable that [comprehensive policies for the management of black bear] should be enacted pursuant to the [APA]." *U.S. Sportsmen's Alliance Found., supra*, 182 *N.J.* at 476–77, 867 *A.*2d 1147. However, at no point in the opinion did the Court state that the CBBMP had to be adopted by rulemaking, and the Court explicitly distinguished between the comprehensive policies required by statute and the Game Code regulations authorizing bear hunts. *See id.* at 461–79, 867 *A.*2d 1147. The Court did not expressly hold that the Commissioner's re-

quired approval of a CBBMP, as a precursor to a bear hunt, either was or was not subject to APA compliance or rulemaking thereunder. *See id.* at 473–77, 867 *A*.2d 1147.

The DEP acknowledges that "[t]he 2005 [C]BBMP was not adopted pursuant to the strict requirements of the APA," and, therefore, contends that it "would not need to be repealed pursuant to the APA." Pursuant to the definition of a rule provided in *N.J.S.A.* 52:14B–2(e), the 2005 CBBMP did not meet the exceptions to what constitutes a rule. It did not "concern[ ] the internal management or discipline of any agency" and did not involve a judicial-type proceeding in a contested case. *N.J.S.A.* 52:14B–2(e); *Maguire, supra,* 368 *N.J.Super.* at 573, 847 *A*.2d 614. Further, it did not constitute an intra-agency statement because it has "a substantial impact on ... the rights or legitimate interests of the regulated public[,]" since its content determined whether a bear hunt could take place. *See Univ. Cottage Club, supra,* 191 *N.J.* at 55, 921 *A*.2d 1122.

On the other hand, the 2005 CBBMP meets all of the *Metromedia* criteria that reflect when "an agency determination must be considered an administrative rule[.]" *See U.S. Sportsmen's Alliance Found., supra,* 182 *N.J.* at 477, n. 3, 867 *A*.2d 1147 (quoting *Metromedia, Inc., supra,* 97 *N.J.* at 331–32, 478 *A*.2d 742). First, the 2005 CBBMP was "intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group[,]" specifically, it affected the entire regulated group of potential bear hunters. *See Metromedia, Inc., supra,* 97 *N.J.* at 331, 478 *A*.2d 742. Second, the CBBMP was "intended to be applied generally and uniformly to all similarly situated persons" in that the policies it laid out for management of black bears applied to all areas where black bears were present and generally addressed contact with the bears. *Ibid.* Third, the 2005 CBBMP was "designed to operate only in future cases, that is, prospectively[.]" *Ibid.* Fourth, the plan "prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the

enabling statutory authorization[,]" *ibid.*, as it "is not otherwise expressly authorized by or obviously inferable from the specific language of the enabling statute[,]" *id.* at 329, 478 *A.*2d 742. The enabling statute merely gives the Council the authority to create a Fish and Game Code; all implementing details, such as decisions on which animals to hunt and how many should be hunted, were left to the Council. *N.J.S.A.* 13:1B–30. Fifth, the 2005 CBBMP "reflects an administrative policy that ... was not previously expressed in any official and explicit agency determination, adjudication or rule[.]" *Metromedia, Inc., supra,* 97 *N.J.* at 331, 478 *A.*2d 742.

Regarding the fifth *Metromedia* prong, the Supreme Court explained that

> [t]he APA itself recognizes that an agency action or determination "that implements or interprets law or policy" can constitute an "administrative rule." *N.J.S.A.* 52:14B–2(e). It is particularly appropriate that parties affected by the proposed agency action have the opportunity to participate in the process leading to the agency determination.
>
> [*Metromedia, Inc., supra,* 97 *N.J.* at 330, 478 *A.*2d 742.]

The 2005 CBBMP "constitute[d] a material and significant change from a clear, past agency position on the identical subject matter" as articulated by the alternative in the fifth *Metromedia* prong, *id.* at 331, 478 *A.*2d 742, because hunts had periodically taken place in the past, and past agency positions were not particularly clear, as demonstrated in the discussion in *U.S. Sportsmen's Alliance Found., supra,* 182 *N.J.* 461, 867 *A.*2d 1147.

Finally, regarding the sixth *Metromedia* prong, the 2005 CBBMP "reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy." *Metromedia, supra,* 97 *N.J.* at 331–32, 478 *A.*2d 742. The regulation only conditionally authorizes a bear hunt; it does not specify the details under which that hunt can take place. *N.J.A.C.* 7:25–5.6(a). Instead, those policy details are left to the CBBMP. *Ibid.* As the Court explained in *Metromedia,* "[w]here the subject matter of the inquiry reaches concerns that transcend those of the individual litigants and implicate matters of general administrative

policy, rule-making procedures should be invoked." *Metromedia, Inc., supra,* 97 *N.J.* at 331, 478 *A.*2d 742. Due to the 2005 CBBMP's setting guidelines as to when and if a hunt can occur, it "implicates matters of general administrative policy," warranting rulemaking.

In essence, although bear hunts took place in the past, the 2005 CBBMP presented a comprehensive plan in response to the Supreme Court's decision in *U.S. Sportsmen's Alliance Foundation* that went beyond prior policies in detail. *See U.S. Sportsmen's Alliance Found., supra,* 182 *N.J.* at 476–79, 867 *A.*2d 1147. Therefore, as already stated, we hold that the CBBMP had to be, but was not, promulgated by rulemaking within the meaning of the APA. Nor was it adopted in "substantial compliance" with the APA. *N.J.S.A.* 52:14B–4(d).

Prior to an agency adopting, amending, or repealing a rule, the APA requires that the agency give the public at least thirty days notice of the proposed change; publicly distribute a summary of the proposed rule, its purpose, the authority under which its adoption is authorized, and various analyses of the proposed rule; give interested parties at least thirty days to submit written and oral comments; review the public comments; under certain circumstances, conduct a public hearing on the proposed rule, providing fifteen days notice prior to the hearing; and prepare a summary of comments received and who submitted them for public distribution. *N.J.S.A.* 52:14B–4. The APA requires "substantial compliance" with its procedures for a rule to be validly adopted. *N.J.S.A.* 52:14B–4(d). The proposed rule must also be submitted to the Legislature for review. *N.J.S.A.* 52:14B–4.1.

The APA was not followed in adopting the 2005 CBBMP. The first announcement to the public regarding the CBBMP was the notice of a hearing, which was posted, pursuant to the APA, fifteen days prior to the hearing. *N.J.S.A.* 52:14B–4(a)(3). That first announcement, dated September 6, 2005, was also made more than thirty days before the 2005 CBBMP was adopted on November 21, 2005, pursuant to *N.J.S.A.* 52:14B–4(a)(1). 37 *N.J.R.* 3458(a)

(Sept. 6, 2005); 37 *N.J.R.* 4474(a) (Nov. 21, 2005). However, the agency did not comply with *N.J.S.A.* 52:14B–4(a)(2), which requires public distribution of "a statement setting forth a summary of the proposed rule, a clear and concise explanation of the purpose and effect of the rule, the specific legal authority under which its adoption is authorized, a description of the expected socio-economic impact of the rule, a regulatory flexibility analysis, or the statement of finding that a regulatory flexibility analysis is not required …, a jobs impact statement …, and an agriculture industry impact statement.…" *N.J.S.A.* 52:14B–4(a)(2). It also failed to comply with *N.J.S.A.* 52:14B–4(a)(4), which required that a report be "prepare[d] for public distribution … listing all parties offering written or oral submissions concerning the rule, summarizing the content of the submissions and providing the agency's response to the data, views and arguments contained in the submissions." *N.J.S.A.* 52:14B–4(a)(4).

On the record before us, we cannot hold that there was "substantial compliance" with the APA in adopting the 2005 CBBMP. We have summarized the following as "the essential requirements for rulemaking under the APA": (1) "an agency must provide notice before promulgating a rule, including publication in the New Jersey Register"; (2) "[t]he public must be granted an opportunity for comment"; and (3) "[u]pon promulgating a rule, the agency must publish a document summarizing the comments and corresponding responses." *Terminal Const. Corp. v. Hoboken–Union City–Weehawken Sewerage Auth.*, 244 *N.J.Super.* 537, 549, 582 *A.2d* 1288 (App.Div.1990), *certif. denied,* 126 *N.J.* 323, 598 *A.2d* 883 (1991). While we have recognized "that administrative agencies must possess the ability to be flexible and responsive to changing conditions," *American Cyanamid Co. v. State, Dept. of Envtl. Prot.*, 231 *N.J.Super.* 292, 310, 555 *A.2d* 684 (App.Div.), *certif. denied,* 117 *N.J.* 89, 563 *A.2d* 847 (1989), the variations from the APA procedures here were significant. At the public hearing on the Bear Management Policy, the agency did not give a presentation of the policy, nor did the agency respond to the public's questions as required by *N.J.S.A.* 52:14B–4(g). The agen-

cy did not publish the list of commenters and summary of comments and responses in the *New Jersey Register;* and the agency did not publish the entire Bear Management Policy in the *New Jersey Register* along with the "Notice of Opportunity for Public Comment."

In *Metromedia,* the Supreme Court found that an agency action was a rule and then invalidated that action because it was not proceeded by "promulgation of rules in compliance with the Administrative Procedure Act." *Metromedia, Inc., supra,* 97 *N.J.* at 337, 478 *A.*2d 742; *see also Univ. Cottage Club, supra,* 191 *N.J.* at 58, 921 *A.*2d 1122. More recently, in *Cooper University Hospital v. Jacobs,* the Court found that an agency improperly acted outside the rulemaking process in approving a medical program that was inconsistent with regulation; as a result, it invalidated the agency action. *Cooper Univ. Hosp., supra,* 191 *N.J.* at 145, 922 *A.*2d 731.

As the 2005 CBBMP was not properly adopted by Rule, and was not lawfully promulgated, it did not have to be vacated by any formal rulemaking because it did not have the force of law.

We thus hold that the 2005 CBBMP should have been adopted as a rule, but is invalid because it was not promulgated according to the APA. The 2005 CBBMP should have been promulgated in accordance with the APA, but was not. In effect, no plan is in place today, not because the Commissioner withdrew approval of the CBBMP in 2006, but because the initial promulgation of the 2005 CBBMP was invalid for failure to follow APA procedures.[3]

---

[3] We are mindful that the Commissioner and the Council lacked definitive judicial guidance on the APA's applicability when they formulated the 2005 CBBMP. *See U.S. Sportsmen's Alliance Found., supra,* 182 *N.J.* at 476–77, 867 *A.*2d 1147 (noting that the APA's applicability was "at least debatable"). Nonetheless, the substantial public interest in requiring the government to conduct a full-fledged process of notice and comment, as prescribed by the APA, precludes us from excusing the agencies' non-compliance, even on an interim basis. Bear management is a topic that sparks widespread disagreement and strong public sentiments. The need to give the public sufficient notice of the terms of a

Subsequent to the Commissioner's withdrawal of approval of the 2005 CBBMP, the Council produced a draft 2007 CBBMP, public comments have been invited, and a public meeting was conducted. In response, the Commissioner has written to the Council that she "remain[s] convinced that the 2005 CBBMP does not comport with [her] overarching environmental policies as they pertain to the management of the State's black bear population." In sum, the Council's 2007 policy has yet to be approved by the Commissioner nor adopted by rulemaking or in "substantial compliance" with the APA. No party suggests otherwise. *See N.J.S.A.* 52:14B–4(a)(1),(2),(3),(4); *N.J.S.A.* 52:14B–4(g). However, it appears that efforts have been undertaken which can be utilized to adopt a proper regulation.

In light of our disposition, we find no need to address any other issues raised.

For the reasons given, the 2005 CBBMP is invalid and the Commissioner's subsequent failure to implement a policy is affirmed.

_____

proposed bear management policy, and to respond fully to comments received from citizen objectors and advocates alike, is particularly salient here.