**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0672-23

NEW JERSEY BLACK BEARS
(URSUS AMERICANUS),[1]
ANIMAL PROTECTION
LEAGUE OF NEW JERSEY,
ANGELA METLER, DOREEN
FREGA, and SUSAN RUSSELL,

     Appellants,

v.

SHAWN M. LATOURETTE, in his
capacity as Commissioner of the
Department of Environmental
Protection, NEW JERSEY
DEPARTMENT OF
ENVIRONMENTAL  PROTECTION,
DAVE GOLDEN, in his capacity
as Assistant Commissioner of the
New Jersey Division of Fish and
Wildlife, NEW JERSEY DIVISION
OF FISH AND WILDLIFE, FRANK
VIRGILIO, in his capacity as
Chairman of the New Jersey Fish

---

[1]  Inasmuch as New Jersey Black Bears (Ursus Americanus) are animals, see N.J.S.A. 13:1B-30, they are not a cognizable party to this appeal, see N.J.A.C. 6A:3-.13 (providing "[a] petitioner shall name as a party any person or entity indispensable to the hearing of a contested case" (emphasis added)).

and Game Council, and NEW JERSEY
FISH AND GAME COUNCIL,

Respondents.

_____

Argued September 30, 2025 – Decided October 17, 2025

Before Judges Rose and Torregrossa-O'Connor.

On appeal from the New Jersey Department of
Environmental Protection.

Doris Lin argued the cause for appellants.

Cristin D. Mustillo, Deputy Attorney General, argued
the cause for respondents (Matthew J. Platkin, Attorney
General, attorney; Sookie Bae-Park, Assistant Attorney
General, of counsel; Cristin D. Mustillo, on the brief).

PER CURIAM

In this latest opposition to this State's black bear hunt, appellants Animal

Protection League of New Jersey, Angela Metler, Doreen Frega, and Susan

Russell challenge the validity of the 2022 Comprehensive Black Bear

Management Policy (2022 CBBMP or Policy), adopted by respondents New

Jersey Fish and Game Council (Council), an entity within the New Jersey

Division of Fish and Wildlife (DFW), a division of the New Jersey Department

of Environmental Protection (DEP), which approved the Policy.[2]  In their overlapping arguments before us, appellants contend adoption of the 2022 CBBMP was arbitrary and capricious, violated the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -15, and failed to satisfy the governing statutory scheme and judicial precedent.  Based on our review of the record, in light of our limited standard of review of an agency's rulemaking under the APA, see N.J. Ass'n of Sch. Adm'rs v. Schundler, 211 N.J. 535, 548-49 (2012), we disagree and affirm.

I.

Litigation surrounding this State's controversial bear hunt is well-chronicled.  See, e.g., U.S. Sportsmen's All. Found. v. N.J. Dep't of Env't. Prot., 182 N.J. 461, 478 (2005) (delineating factors for determining whether a bear hunt may be held); Safari Club Int'l v. N.J. Dep't of Env't. Prot., 373 N.J. Super. 515, 521 (App. Div. 2004) (upholding the DEP Commissioner's order "clos[ing] all lands owned, managed[,] or controlled by the DEP to bear hunting"); N.J. Animal Rts. All. v. N.J. Dep't of Env't. Prot., 396 N.J. Super. 358, 373 (App.

---

[2]  Appellants also named respondents Shawn M. LaTourette, in his capacity as Commissioner of the DEP, Dave Golden in his capacity as Assistant Commissioner of the DFW, and Frank Virgilio, in his capacity as Chairman of the Council.

A-0672-23

Div. 2007) (invalidating the 2005 CBBMP and affirming the DEP Commissioner's subsequent failure to implement a policy); Animal Prot. League of N.J. v. N.J. Dep't of Env't. Prot. (Animal Protection League I), 423 N.J. Super. 549, 554-55 (App. Div. 2011) (upholding the validity of the 2010 CBBMP); Animal Prot. League of N.J. v. N.J. Fish and Game Council (Animal Protection League II), 477 N.J. Super. 145, 167 (App. Div. 2023) (invalidating the enactment of the 2022 CBBMP by emergency rulemaking, without reaching the Policy's substantive aspects, by concluding the public was deprived the opportunity for meaningful notice and comment).

In Animal Protection League II, we summarized the Council's statutory and regulatory authority as it pertains to the hunt:

> Pursuant to N.J.S.A. 13:1B-30, the Council is authorized, in pertinent part, "to determine under what circumstances . . . by what means and in what amounts and numbers . . . game animals[ ] and fur-bearing animals . . . may be pursued, taken, killed, or had in possession . . . to maintain an adequate and proper supply thereof." The statute empowers the Council to adopt and amend the [State Fish and Game Code (Game Code), N.J.A.C. 7:25-5.1 to -5.39,] "to preserve, properly utilize[,] or maintain the best relative number of any [such] species or variety thereof." Ibid. The Game Code, in turn, permits the State to conduct an annual bear hunt, provided — as a condition precedent — a CBBMP "has been approved by the Council and [DEP] Commissioner and adopted pursuant to the

> [APA]."  N.J.A.C. 7:25-5.6; <u>see also</u> <u>Sportsmen's All.</u>,
> 182 N.J. at 476.
>
> [477 N.J. Super. at 152-53 (first, third, fourth, fifth, and
> sixth alterations in original).]

In <u>Sportsmen's Alliance</u>, our Supreme Court expressly recognized a black bear hunt authorized by the Council is subject to the DEP Commissioner's approval of comprehensive policies, that is a CBBMP, set forth in N.J.S.A. 13:1B-28.  182 N.J. at 474, 478.  In doing so, the Court explained the term, "'comprehensive policies,' within the meaning of N.J.S.A. 13:1B-28. . . . clearly envisions more than vague statements of general aspiration." <u>Id.</u> at 477.  Rather, the term "refers to a thorough statement of guidelines that set forth not only end-point objectives but also the means that should be used to attain those ends." <u>Id.</u> at 478.  Thus, "[c]omprehensive policies provide a detailed outline of the mandated approach to the topic at issue." <u>Ibid.</u>

As the <u>Sportsmen's Alliance</u> Court noted under the circumstances of that case – and equally applicable here – "comprehensive policies should at least include . . . broad preservation goals . . . , tools at the . . . Council's disposal to accomplish those goals, and most importantly, the factors that should be considered when determining which tools will be utilized." <u>Ibid.</u>  According to the Court, "[t]he last category is the most complex and <u>may</u> include

5

consideration, among other things, of the absolute size of the bear population, the number of harmful bear-human interactions and the fiscal and human resources available to carry out the stated goals." Ibid. (emphasis added).

"The Game Code provides specific terms for the hunt including the season dates and methods of harvest." Animal Protection League II, 477 N.J. Super. at 153 (citing N.J.A.C. 7:25-5.6). Pursuant to N.J.A.C. 7:25-5.6, the hunt is held during "two hunting segments: Segment A beginning on the second Monday in October, and Segment B concurrent with the firearm deer season, typically occurring in December." Ibid.

Historically, the DFW has utilized the Lincoln-Petersen Index (L-P Index) to estimate the number of bears in New Jersey. The index is a method of "mark-recapture," wherein black bears are tagged or marked through the DFW's trapping efforts and hunter harvests comprise the recapture portion of the index. The total population is estimated based on the number of tagged bears harvested. Since 2016, the DFW has calculated the L-P Index population estimate using the data from Segment A hunts only. Because no Segment A hunts occurred in 2021 or 2022, the L-P Index was not updated during those years.

A-0672-23

With those principles in view, we turn to the issues raised on this appeal, some of which were argued by most of the appellants[3] in <u>Animal Protection League II</u>. Unlike the concurrent emergency regulations at issue in that case, the 2022 CBBMP challenged here was promulgated pursuant to the APA's notice and comment requirements. We summarize the pertinent facts and events from the record provided on appeal.

On January 18, 2023, while the appeal in <u>Animal Protection League II</u> was pending, the DEP and DFW held a public hearing on the adoption of the 2022 CBBMP, separate from their concurrent emergency rulemaking. Through February 2023, the Council received 3,637 comments regarding the proposed rule and 4,856 preprinted postcards opposing it.

On September 6, 2023, the Council adopted the 2022 CBBMP and amendments to N.J.A.C. 7:25-5 of the Game Code. The Policy as adopted contained no substantive changes from the proposed 2022 CBBMP,[4] but omitted the twenty-seven-page proposal summary section.

---

[3] Neither New Jersey Black Bears (Ursus Americanus) nor Susan Russell were parties to the prior appeal.

[4] The adopted 2022 CBBMP identified changes to the proposed 2022 CBBMP with an asterisk and italic type style.

A-0672-23

Pertinent to this appeal, the proposal summary estimated the 2020 black bear population at 3,158 bears, but noted "[b]ased upon their continued monitoring of this population, [s]tate biologists project[ed] that the bear population . . . w[ould] approach or exceed 4,000 bears within the next two years if immediate measures to control the population were not implemented." Further, the proposal summary stated, "[t]he [DEP] received 1,538 bear damage and nuisance reports between January 1, 2022 and October 21, 2022, representing a 237[%] increase compared to the same time period in 2021." The proposal summary also indicated the DEP's non-lethal management techniques could not "fully offset the likelihood of bear-human interactions when the bear population continues to grow." It further stated reduction of the bear population in the remaining months of 2022 was critical to avoid continued unchecked growth of the population and reduce the likelihood of bear-human interactions, both of which were projected to increase in 2023.

The proposal summary also included statements pertaining to the social, economic, and environmental impacts of the proposal. Relevant here, the environment impact statement provided:

> [T]he [2022] CBBMP should have little environmental impact; however, implementation of the policy is expected to result in the conservation, management[,] and enhancement of the State's bear resource by

A-0672-23

categorizing bear habitat and supporting existing efforts to preserve habitat that not only supports a viable bear population but other associated wildlife species.

The adopted 2022 CBBMP provided an extensive recitation of the status and history of black bears in New Jersey. Although the 2022 CBBMP did not reference the projected 4,000 bears included in the proposal summary, the Policy nonetheless noted the 2020 population was approximately 3,158 bears and "w[ould] continue to increase unless State lands remain open to black bear hunting." Compare 54 N.J.R. 2206 with 54 N.J.R. 2211-27. Pertinent to appellants' contentions before us, the 2022 CBBMP included black bear population estimates from 2003, 2005, and 2010-20, but no estimates from 2021 or 2022.

The 2022 CBBMP expressly identified eight black bear management objectives:

● Manage the bear population at a level commensurate with available habitat and consistent with reducing risk to public safety and property.

● Sustain a robust black bear population as part of New Jersey's natural resource base.

● Continue to advance the scientific understanding of black bears.

● Educate the public about common-sense practices that reduce the risk of negative black bear behavior on humans, their homes, their properties, and their communities.

● Ensure that regulated hunting remains a safe and effective management tool to provide recreation and control New Jersey's black bear population.

● Strengthen and enforce the law on bear feeding and garbage containment.

● Use lethal control on high-risk, dangerous bears.

● Utilize non-lethal aversive conditioning techniques on nuisance bears.

The 2022 CBBMP further detailed the Council's additional goals and objectives within the "integrated black bear management strategy" section, including bear population management, lethal and non-lethal bear control, education, control of human-derived food, research, cooperative research, and habitat protection.

Within the "bear population management" component, the 2022 CBBMP expressed its goal: "to manage the New Jersey black bear population at a level that minimizes human-bear conflicts, provides for a sustainable population within suitable bear habitat, and minimizes emigration of bears to unsuitable habitat in suburban and urban areas." Citing population growth, the Council noted "control through a regulated hunting season that is open on public and private lands is essential for meeting population management objectives."

10

Tracking our Supreme Court's instructions in Sportsmen's Alliance, 182 N.J. at 478, the Council stated its tools for population reduction "may include consideration of the absolute size of the bear population, the number of harmful bear-human interactions and the fiscal and human resources available to carry out its goals."

In the 2022 CBBMP, the Council considered the effectiveness of three proposed methods to accomplish population reduction: relocation; alternative methods of population control, including fertility control; and regulated hunting. Within each of these three tools, the 2022 CBBMP included considerations regarding their use, consistent with Sportsmen's Alliance.

For example, as to relocation, the 2022 CBBMP considered no state had successfully used relocation as a means of population control and that this tool would simply "transfer the issue to a new location." Regarding alternative methods of population control, the 2022 CBBMP cited studies showing "fertility control is not a feasible option for large-scale black bear management." As to the regulated hunting method, the 2022 CBBMP cited and summarized voluminous materials, concluding a hunt was a viable tool for managing the

11

black bear population.[5]  Because the DFW "conducts ongoing monitoring," the 2022 CBBMP noted the Council could regularly review and change the hunting regulations.  The 2022 CBBMP concluded that a harvest rate of twenty percent is necessary to effectuate a population reduction and recommended closure of each hunting season if the harvest rates reach thirty percent.  The 2022 CBBMP recommended an annual hunt without specifying an end date.

On September 7, 2023, the 2022 CBBMP was filed "<u>with non-substantial changes</u> not requiring public notice and comment [under] N.J.A.C. 1:30-6.3."  55 N.J.R. 2056(a) (Oct. 2, 2023).  Effective October 2, 2023, the Policy expires on May 11, 2028.

On October 3, 2023, appellants sought a stay before the Council and DEP, challenging the 2022 CBBMP on procedural and substantive grounds.  In their application, appellants claimed the Council "omitted the data from the 2022 bear

---

[5]  Some of the materials were issued in the 1980s.  Of the thirty-four articles, thirteen studies, and various other materials considered, four articles were included in appellants' appendix.

In their appendix, appellants also included other scientific and academic materials.  Although it is unclear whether all these materials were presented to the Council, they also were included in appellants' appendix in support of their appeal in <u>Animal Protection League II</u>, with our permission.  477 N.J. Super. at 151.  Although appellants did not move to supplement the record with these materials in this appeal, we have nonetheless considered their submission.

hunt." Citing their own calculation of the bear population using the L-P Index as applied to Segment B data, appellants claimed only 1,614 black bears were living in New Jersey, "[f]ar less than the Council's estimate of 4,000 bears." Appellants thus argued this omission from the 2022 CBBMP was arbitrary and capricious. In view of this omission, appellants argued "the adopted CBBMP contain[ed] substantial changes compared to the proposed CBBMP" and, as such, "its adoption violate[d] N.J.S.A. 52:14B-4.10."

Two days later, the Council's chairman denied appellants' application for a stay. Among other reasons, the chairman noted "the [L-P] estimator utilizes the recapture data collected in Segment A," there was no hunting during that segment, and the hunt during Segment B "was truncated." Accordingly, the 2022 CBBMP did not omit population information. This appeal followed.

## II.

Our circumscribed standard of review of an agency's rulemaking under the APA is well established. See Animal Protection League II, 477 N.J. Super. at 160. As our Supreme Court has recognized "[c]ourts afford an agency 'great deference' in reviewing its 'interpretation of statutes within its scope of authority and its adoption of rules implementing' the laws for which it is responsible."

A-0672-23

Schundler, 211 N.J. at 549 (quoting N.J. Soc'y for Prevention of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 385 (2008)).

"[J]udicial deference to administrative agencies stems from the recognition that agencies have the specialized expertise necessary to enact regulations dealing with technical matters and are 'particularly well equipped to read and understand the massive documents and to evaluate the factual and technical issues that . . . rulemaking would invite.'" N.J. State League of Muns. v. Dep't of Cmty. Affs., 158 N.J. 211, 222 (1999) (quoting Bergen Pines Cnty. Hosp. v. N.J. Dep't of Hum. Servs., 96 N.J. 456, 474 (1984)). An agency's regulations are therefore presumed "valid and reasonable." N.J. Soc'y for Prevention of Cruelty to Animals, 196 N.J. at 385.

Nonetheless, appellate courts must "assure that agency rulemaking conforms with basic tenets of due process, and provides standards to guide both the regulator and the regulated." Id. at 386 (quoting Lower Main St. Assocs. v. N.J. Hous. & Mortg. Fin. Agency, 114 N.J. 226, 236 (1989)); see also St. Barnabas Med. Ctr. v. N.J. Hosp. Rate Setting Comm'n, 250 N.J. Super 132, 142 (App. Div. 1991) (holding the "flexibility" afforded agencies "does not allow an agency to ignore the [APA] dictates").

14

Further, appellate courts are "in no way bound by an agency's interpretation of a statute or its determination of a strictly legal issue," in particular "when 'that interpretation is inaccurate or contrary to legislative objectives.'" Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011) (first quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973); then quoting G.S. v. Dep't of Hum. Servs., Div. of Youth & Fam. Servs., 157 N.J. 161, 170 (1999)). We therefore review de novo "an agency's interpretation of a statute or case law." Ibid.

"The party challenging an administrative regulation has the burden of proving the regulation is either invalid because the agency failed to substantially comply with the APA or is otherwise 'arbitrary, capricious, or unreasonable.'" Animal Protection League II, 477 N.J. Super. at 161 (citing N.J. State League of Muns., 158 N.J. at 222). When deciding whether agency action is arbitrary, capricious, or unreasonable, our role is restricted to three inquiries:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law;
>
> (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and
>
> (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion

15

that could not reasonably have been made on a showing of the relevant factors.

[Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (quoting In re Stallworth, 208 N.J. 182, 194 (2011)).]

With these principles in view, we turn to appellants' various contentions that adoption of the 2022 CBBMP was arbitrary and capricious and failed to satisfy the governing procedural and substantive law.

A. Omission of bear population estimates from 2021 and 2022

Appellants maintain respondents omitted from the 2022 CBBMP crucial bear population data from 2022. Positing the population totaled around 1,614 bears during the Segment B hunt in December 2022, based on their calculation under the L-P index, appellants contend the 2022 CBBMP endangers the black bear species. They further claim these omissions and misrepresentations constituted substantial changes from the proposed Policy, thereby violating the APA.

The record reveals, and respondents acknowledge, they omitted bear population estimates from 2021 and 2022 because "the [L-P] estimator utilizes the recapture data collected in Segment A" and no hunt occurred during Segment A in those years. Accordingly, the 2022 CBBMP included the most recent population estimate using Segment A recapture data, 3,158 bears in 2020.

16

Further, in the course of their concurrent emergency rulemaking, respondents repeatedly projected the bear population could approach 4,000 bears without intervention and there existed a "237[%] increase . . . in bear damage and nuisance reports between January 1, 2022 and October 21, 2022, compared to the same time period in 2021." Respondents thus found "the growing bear populations pose[d] a serious public safety risk."

Based on our review of the record, we conclude respondents reasonably omitted from the 2022 CBBMP the 2021 and 2022 population data. Notably, respondents were not required to consider the precise bear population. As the Council correctly stated in the 2022 CBBMP, the Sportsmen's Alliance Court set forth various factors for determining whether to hold a hunt. It bears repeating those factors "may include consideration, among other things, of the absolute size of the bear population, the number of harmful bear-human interactions[,] and the fiscal and human resources available to carry out the stated goals." 182 N.J. at 478 (emphasis added). These factors are permissive, not mandatory. Further, under N.J.S.A. 13:1B-30, the Council is empowered to hold a hunt irrespective of the precise bear population.

Moreover, respondents did not possess reliable data for 2021 and 2022 because the Segment A hunts did not occur during those years and the previous

17

L-P Index only cited data from Segment A hunts. Although appellants' concerns for overharvest are valid, because their population estimates were based on data from the Segment B harvest in December 2022, their estimate of 1,614 bears is not comparable to respondents' calculations from Segment A.

We therefore conclude respondents reasonably included the most recent available population estimate from 2020. Indeed, the increasing number of bear incidents in 2022 suggested a rising population or, at minimum, a need for additional management to reduce such interactions, consistent with the Council's powers under N.J.S.A. 13:1B-30.

## B. Substantial changes under the APA

Nor are we persuaded by appellants' reprised argument the adopted 2022 CBBMP must be invalidated because it reflected a substantial change from the proposed 2022 CBBMP, requiring additional notice and comment under the APA. In particular, appellants assert the adopted 2022 CBBMP omitted the proposal summary's projection of 4,000 bears without intervention and, by appellants' calculations, the bear population was "much lower."

Under N.J.S.A. 52:14B-4.10(a) of the APA, "substantial changes" refer to:

> any changes to a proposed rule that would significantly:
> enlarge or curtail who and what will be affected by the

A-0672-23

proposed rule; change what is being prescribed, proscribed, or otherwise mandated by the rule; or enlarge or curtail the scope of the proposed rule and its burden on those affected by it.

The statute mandates notice and comment on the proposed rule following a substantial change. Ibid.

Here, the omitted data was contained in the proposal summary accompanying the proposed rule – not within the proposed rule itself. Accordingly, omission of that data did not constitute a substantial change under N.J.S.A. 52:14B-4.10(a). Notably, N.J.S.A. 52:14B-4(a)(2) requires "a statement setting forth a summary of the proposed rule" without expressly mandating publication of the summary with the rule.

In any event, the omitted statement was an estimated population projection, which would not enlarge, curtail, or change the scope of the rule. Moreover, the adopted 2022 CBBMP noted the 2020 population was approximately 3,158 bears and "w[ould] continue to increase unless [s]tate lands remain[ed] open to black bear hunting." Compare 54 N.J.R. 2206 with 54 N.J.R. 2211-27.

C. Compliance with N.J.S.A. 13:1B-28 and Sportsmen's Alliance

Appellants further argue the 2022 CBBMP was invalid because respondents failed to comply with the requirements of N.J.S.A. 13:1B-28 and

19

Sportsmen's Alliance, 182 N.J. at 461. Specifically, appellants contend the adopted 2022 CBBMP contained no end-point goals and failed to list the requisite factors for determining which tools will be utilized. The record belies these contentions.

As summarized above, the 2022 CBBMP included a black bear management strategy with various components and objectives. The eight "black bear management objectives" listed in the Policy satisfy the end-point goals required under Sportsmen's Alliance, as they clearly enumerate the Council's purposes regarding black bear management. In addition, the components of the black bear management strategy, including bear population management, bear control, human-derived food control, education, research, and habitat protection are goals consistent with the Council's statutory role. The Council's conclusion that a hunt with a harvest rate of twenty percent is necessary to effectuate a population reduction, with closure of the hunt if harvest rates reach thirty percent satisfies an end-point goal. These goals appear appropriately related to the overall objective of black bear management and consistent with our Court's concerns in Sportsmen's Alliance.

Contrary to appellants' arguments otherwise, the Council's analysis included factors the Sportsmen's Alliance Court held "may" be considered

20

including, among other things, "the absolute size of the bear population, the number of harmful bear-human interactions and the fiscal and human resources available to carry out the stated goals." Id. at 478. For example, in the 2022 CBBMP, the Council appropriately considered relocation of black bears, but a factor in deciding against that method was the determination that no state has successfully used relocation as a means of population control. Rather, a hunt would allow the Council to make necessary changes via regular review and revision of its hunting regulations.

Nor are we persuaded by appellants' argument that the 2022 CBBMP omits a precise bear population or number of bear complaints that, once reached, will eliminate the need for a bear hunt. The Court in Sportsmen's Alliance did not expressly require a precise bear count as an end-point goal. Because the population will likely change over time, we cannot conclude the Council's decision to omit such a precise number was out of bounds.

### D. Scientific attacks to the 2022 CBBMP

Little need be said about the litany of appellants' remaining attacks on the 2022 CBBMP. Arguing the 2022 CBBMP "is scientifically arbitrary and capricious," appellants assert the Policy: (1) facilitates a recreational hunt disguised as bear management; (2) contains a contradictory environmental

21

impact statement; (3) violates the public trust statute, N.J.S.A. 13:1D-150(b); (4) reflects a lack of cultural carrying capacity studies; (5) increases hunting accidents; and (6) fails to consider controlling bear attractants is far more effective than hunting for reducing human-bear conflicts. We briefly address each contention seriatim.

### 1. Recreational hunt

Although they ultimately acknowledge the Council's statutory authority to hold recreational bear hunts, appellants nonetheless argue the 2022 CBBMP is arbitrary and capricious because it facilitates "a recreational hunt disguised as bear management." Indeed, the express terms of N.J.S.A. 13:1B-30 empower the Council to permit bear hunts for "public recreation." Here, however, the record demonstrates the 2022 CBBMP was enacted following various considerations, including an increase in bear incidents and the need for bear population management.

### 2. Environmental impact statement

Appellants argue the proposal summary contained a "contradictory environmental impact statement." They contend the Council's assertion in the environmental impact statement, that "the [2022] CBBMP 'should have little

A-0672-23

environmental impact'" is at odds with statements elsewhere in the 2022 CBBMP that a hunt will reduce the bear population to "manageable" levels.

Appellants ignore the entirety of the environmental impact statement wherein the Council acknowledged the likely change in the bear population and the 2022 CBBMP's goal to ensure the "conservation, management[,] and enhancement" of the bear population. The record shows the Council discovered increased bear incidents and nuisance behavior in 2022 and implemented the 2022 CBBMP in response. The Council's decision to manage the bear population in this manner, particularly with an eye toward habitat preservation, fits squarely within its afforded discretion under N.J.S.A. 13:1B-30.

We likewise are not persuaded by appellants' argument that a thirty percent harvest rate would permit the killing of thirty percent of this State's bears thereby endangering the bear population. To support their contention, appellants cite a study that found bears "probably self-regulate" their population. However, under N.J.A.C. 7:25-5.6(a), the harvest rate is based on the number of tagged bears harvested rather than the entire population. Thus, a hunt could yield less than thirty percent of the entire population.

23

### 3. Public trust statute

Appellants argue respondents failed to consider "the will of the majority of the public" when deciding how bears will be managed. They contend the 2022 CBBMP violates "[t]he public trust doctrine, established in Arnold v. Mundy, 6 N.J.L. 1 (1821) and recently codified in [N.J.S.A. 13:1D-150(b)]." The statute and the Policy belie their argument.

N.J.S.A. 13:1D-150(b) provides:

> The public trust doctrine establishes the rule that ownership of the State's natural resources, including, but not limited to, ground waters, surface waters, and land flowed or formerly flowed by tidal waters is vested in the State to be held in trust for the people, that the public has the right to tidal lands and waters for navigation, fishing, and recreational uses, and, moreover, that even land that is no longer flowed by the tide but that was artificially filled is considered to be public trust land and the property of the State[.]

The statute plainly describes this State's ownership of its natural resources, primarily ground, surface, and tidal waters, "to be held in trust for the people." Ibid. Assuming without deciding the statute encompasses black bears, appellants fail to demonstrate the hunt authorized under the Policy breaches the public trust doctrine. Instead, the record suggests the 2022 CBBMP is an effort to manage the black bear population in a safe manner and to ensure their long-

24

A-0672-23

term viability in a densely populated state, following an increase in bear incidents and nuisance reports.

### 4. Lack of cultural carrying capacity studies

Appellants argue, unlike the authorities in New York and Pennsylvania, respondents failed to conduct any cultural carrying capacity studies, or studies examining the number of bears "humans will tolerate." Appellants have not cited, and our independent research has not revealed, any authority requiring the Council to conduct such studies. In any event, the record reveals the Council considered cultural carrying capacity by tracking black bear incidents and complaints.

### 5. Hunting accidents

Citing thirty-four deaths from hunting accidents in the past fifty years versus one death from a bear attack in this State's recorded history, appellants argue the bear hunts have increased the number of hunting accidents. To support their argument, appellants include in their appendix a one-page chart captioned "New Jersey Hunting Related Shooting Incidents 1995-present," ending in 2021. However, the chart does not disclose the number of hunting accidents attributed to black bear hunting during that period.

A-0672-23

In the 2022 CBBMP, the Council expressly determined "[h]unting is a safe, legal, responsible use of the renewable wildlife resource" and "New Jersey hunting seasons have established that hunters can safely harvest black bears in a controlled manner." Because appellants' contention that the bear hunt has increased hunting accidents is not supported by the record, we discern no reason why we should not defer to respondents' findings.

### 6. Bear attractants

Lastly, appellants claim controlling bear attractants is more effective than hunting for reducing human-bear conflict. To support this argument, appellants cite several academic studies, concluding the removal of food sources reduced the number of human-bear conflicts.

The 2022 CBBMP noted "[i]n adopting an integrated strategy, [the] Council recognize[d] that both lethal and non-lethal methods are necessary to manage black bears." The 2022 CBBMP thus included recommendations for non-lethal bear management, including "aversive conditioning techniques" and "control of human-derived food" in addition to the hunt. Accordingly, the Council appropriately recognized the need for both lethal and non-lethal measures to manage the black bear population in response to a significant increase in bear incidents and nuisance reports in 2022. The Council's

26

determination is supported by the record, not inconsistent with the studies cited by appellants, and entitled to significant deference.

Based on our review of the record in light of our circumscribed standard of review, see Schundler, 211 N.J. at 549, we cannot conclude adoption of the 2022 CBBMP was "arbitrary, capricious, or unreasonable," see N.J. State League of Muns., 158 N.J. at 222. Nor is it inconsistent with the governing procedural and substantive principles. Accordingly, we discern no basis to disturb the Policy.

To the extent not addressed, appellants' remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-0672-23